No. 15,540.

NEWTON OIL COMPANY *v.* BOCKHOLD ET AL.

(176 P. [2d] 904)

Decided December 4, 1946. Rehearing denied January 13, 1947.

Mr. Max P. Zall, for plaintiff in error.

Mr. William H. Scofield, Mr. Ivor O. Wingren, Mr. Clarence E. Wampler, for defendants in error.

*En Banc.*

Mr. Justice Stone delivered the opinion of the court.

Plaintiff Bockhold, a sixty-five year old Kansas farmer and small-scale oil producer, entered into agreement with defendant oil company, an Arizona corporation (hereinafter referred to as defendant or the company), whereby he assigned to it certain oil and gas leases and drilling equipment held by him in the Rangely district of Colorado. Under the terms of this agreement he made an absolute sale of all his rights for a recited price of $250,000 payable (largely to plaintiff's creditors) by the defendant out of the proceeds of production from the property described in said leases on an agreed percentage basis. The agreement gave defendant a five months' option either to pay certain back rental and debts of plaintiff or to terminate the agreement, but required that plaintiff immediately execute assignment of all his interest in the leases to be deposited with an

officer of defendant. The contract contained no specific requirements whatever as to exploration for oil or gas, and reserved to plaintiff no royalty whatever, so he had only his unsecured claim against the defendant for any moneys to become due thereunder.

Five days after execution of this first agreement a second instrument, identified as Exhibit B, was signed by plaintiff and defendant, which, after reciting the prior agreement, so far as here pertinent reads as follows:

"Whereas, in order to effectively and successfully carry out the terms of said agreement and operate the properties therein referred to profitably, it is deemed advisable that Bockhold continue to render services, assistance and aid to the company in the management and operation of said properties, and to cooperate with the acts and advice; and

"Whereas, the company will from time to time call upon Bockhold to render services and Bockhold will from time to time render such services, and it is deemed desirable to compensate said Bockhold for such services rendered and to be rendered;

"Now, therefore, for and in consideration of the mutual covenants, promises, agreements and benefits of and to each of the parties hereto, the receipt and sufficiency whereof is hereby confessed and acknowledged, it is hereby mutually agreed as follows:

I.

"Bockhold will assist the company in all ways possible to operate and develop the properties referred to in the agreement and transfer between Bockhold and the company hereinabove referred to, and will render such services from time to time as the company shall request and require, and give such advice, opinions and information as he shall be called upon to give, which information is within the knowledge of the said Bockhold, and will in

all manner cooperate and assist the company not only in the operation and development of the properties covered by the said agreement above referred to, but also in the acquisition and development of other properties in the same general area.

## II.

"The company will compensate said Bockhold for such services rendered and to be rendered a total of Forty-two Thousand One Hundred Sixty-five Dollars Ten Cents ($42,165.10), which said payment shall be made in the following manner and under the following terms, to-wit: after the full payment of the $250,000.00 provided to be paid under the agreement and transfer of August 5th, 1942, the company shall continue to make payments in the same manner and in the same percentage as provided for in said agreement, until there has been paid to the trustees in said agreement named the amount hereinabove referred to, to-wit: $42,165.10. The trustees shall thereupon and as said payments are received pay the same to the said Bockhold.

## III.

"Bockhold shall render the services described in Paragraph I hereof so long as any portion of the payment to be made under this agreement remains unpaid."

For a short time after the execution of these instruments, plaintiff remained in Denver and was frequently at defendant's office where he signed numerous documents pertaining to the property sold, and during the next five months the company made nine payments to him of twenty-five dollars each. The purpose of these payments is in dispute, plaintiff testifying to an agreement prior to signing the contract for payment of twenty-five dollars per week to the end of the year, after which he expected income from production, and defendant's president, Silas M. Newton, testifying that they were advances by reason of "the contract," al-

though at the time the payments were made the company had not yet exercised its option to accept the contracts and no such payments are provided for under either contract. After those payments, defendant apparently gave no further attention to plaintiff. Other than signing the documents concerned with its purchase from him, defendant did not call upon him for services of any sort. Plaintiff asked defendant for employment in order to make a living, and testified that in reply he was asked if he didn't have a farm to go to. He then took employment elsewhere. Some eight months after the execution of the instruments here involved, plaintiff returned to Rangely and there procured an oil and gas lease on a parcel of land known as the Heffley property, adjoining, and partly surrounded by, the lands to which he had by his first contract assigned leases to defendant. Upon learning of this, defendant made demand upon him for assignment of this Heffley lease and tendered him an assignment for execution. This demand was refused by plaintiff who then for the first time consulted counsel, and as an attorney fee assigned to him a fourth interest in the Heffley lease.

Thereafter plaintiff instituted this action for cancellation of Exhibit B as being without consideration, without mutuality and impossible of performance. Defendant, in its answer, by counterclaim, stood on the validity of Exhibit B, and alleged that plaintiff had procured the Heffley lease; that it was procured in violation of the terms of Exhibit B; that he had refused to assign the lease to defendant and had assigned an interest to his attorney, and that the latter had taken the assignment with notice of plaintiff's obligations to defendant. Defendant thereunder prayed for specific performance of Exhibit B and that plaintiff be required to assign the Heffley lease to defendant. Plaintiff's attorney Wingren was joined as third party defendant and both plaintiff and Wingren answered the counterclaim by admitting the lease and the assignment of interest to Wingren and

denial of all other allegations. At the close of plaintiff's case, defendant moved for judgment of dismissal. The court reserved ruling until after evidence of both parties was given on the issues raised by the counterclaim. After full trial of those issues, judgment of dismissal of plaintiff's cause of action was entered in favor of defendant, while on defendant's counterclaim, the court's findings and judgment were in favor of plaintiff and the third party defendant. Both parties here seek a reversal of the rulings against them.

■ Defendant first urges as error that the decision of the court below was on a "theory" not raised by the pleadings and next contends that it is contrary to the pleadings. The court is not restricted to theories of counsel, but has the duty of attempting a just determination of the issues tendered pursuant to established rules of law. In the instant case plaintiff alleged the invalidity of Exhibit B and this allegation was denied by defendant; defendant in its counterclaim alleged that plaintiff's taking of the Heffley lease was in violation of the terms of Exhibit B, and plaintiff, answering, admitted the taking of the lease, but denied all other allegations. The issue tendered by the complaint and answer thereto was the validity of Exhibit B; that presented by the counterclaim and answer thereto was whether the lease was taken in violation of Exhibit B. Therein, also, the defendant had to stand on the validity of Exhibit B and could not succeed if it was invalid.

■ Defendant further specified as error that, "the trial court in its findings misquoted the evidence." This charge has no basis in the record. The court made no attempt to quote the testimony. Its conclusion from the evidence, as recited in the part of the opinion to which counsel for defendant refers, was entirely justified. In any event, a misunderstanding or misquotation of evidence is not ground for reversal, if the conclusion of the court is correct.

Defendant's other specifications have to do with the

interpretation of Exhibit B. The interpretation of this contract is the one substantial issue of the case, plaintiff contending that the court erred in holding it a valid contract, and defendant asserting that it constitutes a valid and unambiguous contract of employment requiring no interpretation. Looking to the terms of the "contract" itself, plaintiff's obligations thereunder appear to fall into four groups:

1. To "assist the company in all ways possible to operate and develop the properties" he had sold to defendant. 2. To "render such services from time to time as the company shall request and require." 3. To "give such advice, opinions and information as he shall be called upon to give." 4. To "in all manner cooperate and assist the company * * * in the acquisition and development of other properties in the same general area."

If plaintiff were an attorney or a petroleum engineer or a specialist in any line connected with exploration for, or production or marketing of, oil and gas, possibly the services intended by the provisions in the first, second and third groups of this agreement might be suggested from the nature of his qualifications, but here plaintiff is an elderly farmer with limited and unsuccessful experience in any department of the oil industry. What services, then, does this agreement contemplate? He is plainly to give such advice, opinions and information as may be called for but, in view of his limited experience and education in the industry, this would be of little value, and his obligation to "assist the company in all ways possible" might only be practically carried out by his working as a laborer or in charge of a crew. Does the contract obligate plaintiff, upon request, to become a full-time worker for the company, in any capacity the latter may see fit to require, without compensation, even for his bed and board, until such distant time, if ever, as the compensation mentioned in the contract shall become payable? Newton did not so understand it. He testified that plaintiff came to him asking

for money and for employment in the field, and that he said to plaintiff, "Of course, John, you understand that we have not employed you to do any physical labor." What were the services that this inexpert man was to be required to perform under the contract? If services of any sort other than advice, opinions and information were called for and refused, by what rule could the court determine whether or not there had been a breach of the contract thereby? Referring to the fourth group of obligations, in what manner is plaintiff required to cooperate and assist in the acquisition and development of other properties? What services is he called upon to perform? Does cooperation and assistance require that any lease obtained by him without the company's request or suggestion be assigned to it without repayment even of the price plaintiff may have paid for it or of his expenses in procuring it, as here demanded? The trial court, by its finding, correctly answered this last question in the negative.

Again, what construction can be given to the phrase, "in the same general area"? Does that mean on and about the same structure, or in the same field, or does it include that general producing area or the field of prospective production in that part of the state? What leases could plaintiff take for himself and what leases was he obligated to assign the company?

The one possible guide to construction would be the recital of the purpose of this agreement which is "in order to effectively and successfully carry out the terms of" plaintiff's sale of leases to defendant "and operate the properties therein referred to profitably." In what way will the acquiring of other leases make profitable the operation of the leases theretofore assigned?

Again, what is the duration of service required of plaintiff under this agreement? It is required so long as any portion of the payment to be made thereunder remains unpaid. The payment to plaintiff is to be made entirely from proceeds of production from the leases

originally assigned. It matters not how great the production from the lease now demanded of him or from the leases he may hereafter acquire and assign to the company; he will get nothing therefrom. The less the production from his leases originally sold to the company, the longer his term of service. If those lands should never produce in paying quantities, then would he be obligated to work for the company forever, without possibility of compensation, even though the lease now demanded of him might bring the company the wealth of the Indies? In the event of plaintiff's death or disability before full payment, how would the earned portion of compensation be computed? Such questions illustrate the uncertainties attendant upon the instrument from which arises the inevitable conclusion that if the minds of the parties ever met as to services and obligations to be rendered by plaintiff to defendant, such services and obligations cannot be ascertained from the instrument itself.

A fundamental contractual requirement is that of certainty. The minds of the parties must have met. Where one party may have intended a certain obligation, and the other party intended a different one, and from the wording of the instrument itself there is no rule by which the true intention can be determined, no contract results. "The offer must not merely be complete in terms, but the terms must be sufficiently definite to enable the court to determine whether the contract has been performed or not." 1 Page on the Law of Contracts, page 135, §95. "As a promise may insufficiently specify the price to be paid, so the consideration for which the price is to be paid may be left equally uncertain, and in such a case it is not usually possible to invoke the standard of reasonableness in order to give the promise sufficient definiteness to make it enforceable." 1 Williston on Contracts, Revised Edition, page 119, §42. "The court can supply some elements in a contract, but they cannot make one; and when the lan-

guage in a contract is too uncertain to gather from it what the parties intended, the courts cannot enforce it." *Ryan v. Hanna,* 89 Wash. 379, 154 Pac. 436. "A court will not undertake to enforce a contract, unless by some lawful means it can ascertain and know just what the contract bound each party to do." *Lester v. Hinkle,* 193 Ind. 605, 141 N.E. 463. "An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain." Restatement of the Law—Contracts, p. 40, §32. We are compelled to the conclusion that the ruling of the trial court on defendant's counterclaim was correct, for the reason that the contract Exhibit B is so patently indefinite and uncertain as to the obligations thereunder as to be void on its face.

 The judgment on the counterclaim being affirmed on the ground that Exhibit B is void on its face, is not that ground also necessarily conclusive and determinative of plaintiff's cause of action as well as defendant's counterclaim? Defendant insists that since the trial court sustained its motion for a nonsuit, then, in the event we do not affirm such action of the trial court, we must permit defendant to introduce proof before making an adverse determination of the issue. Such is undoubtedly the rule. However, here, defendant was under the same obligation of proof as to the validity of Exhibit B on the issue raised by the counterclaim as on the issue raised by the complaint. Had the contract been found valid for the purpose of the counterclaim, that finding would necessarily have defeated plaintiff's cause of action set out in his complaint. It could not be valid as controlling the lease and at the same time be void generally. On the other hand, the contract having been found void on its face in determining the issue of the counterclaim, it is void always and under all circumstances. Such being the case, it would be idle to send it back for further hearing on the issue of its gen-

eral validity, on the ground that defendant's evidence, which was equally required of it on each issue, was offered in proof of the latter issue only. It would be futile for us to deny a declaratory judgment as sought by the complaint; we have necessarily decided that issue in our determination of the counterclaim.

The judgment of the court below on the cross complaint in favor of plaintiff and the third party defendant and against the defendant is affirmed. The judgment of dismissal of plaintiff's complaint is reversed, with instruction to enter judgment in favor of plaintiff and against defendant thereon.

MR. JUSTICE BURKE dissents.

MR. JUSTICE JACKSON and MR. JUSTICE BAKKE not participating.