## UNDERWRITERS SALVAGE CO. OF NEW YORK v. DAVIS & SHAW FURNITURE CO. et al.

No. 4381.

United States Court of Appeals
Tenth Circuit.

July 15, 1952.

Rehearing Denied Aug. 12, 1952.

Winston S. Howard, Denver, Colo. (Pershing, Bosworth, Dick & Dawson, and Arthur K. Underwood, Jr., Denver, Colo., on the brief), for appellant.

Dayton Denious and Kenneth M. Wormwood, Denver, Colo. (Denious & Denious and William T. Wolvington, Denver, Colo., on the brief), for appellees.

Before BRATTON, HUXMAN and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

The plaintiffs, as owner and tenant of a building in Denver, Colorado, brought this action to recover damages to the building caused by a fire occurring after the defendant, Underwriters Salvage Company of New York,[1] had entered into the performance of

1. Hereinafter referred to as Salvage.

a contract with the plaintiff, Davis and Shaw, and others, to remove from the building all the furniture therein which had been damaged by a previous fire. The complaint alleged that on August 3, 1948, a fire occurred which damaged the furniture and other articles stored in the plaintiffs' warehouse building, and that the building was damaged by the same fire, but was left in a condition in which it could be restored and repaired. The complaint then alleged that the defendants undertook, for a valuable consideration, to salvage the furniture and other articles in plaintiffs' building and to watch over and protect the building and its contents; that the defendants negligently and carelessly failed and neglected to properly or adequately watch over and protect the warehouse and its contents; and that as a result of that negligence and carelessness another fire broke out in the building on August 14, 1948. The complaint further alleged that the defendants negligently and carelessly failed to discover such fire promptly or within a reasonable time; that by reason of this carelessness and negligence the fire spread and reached such proportions that it could not be controlled when the fire department arrived after being notified by a third party; and that by reason of the negligence of the defendants the plaintiffs suffered the damages prayed for.

In its answer Salvage denied the negligence and admitted that on August 4, 1948, it entered into a written contract with plaintiff, the Davis and Shaw Furniture Company, whereby it agreed to put that plaintiff's stock of merchandise, which had been stored in the warehouse building, in the best possible condition and sell it for the best interests of those concerned. It admitted that it employed Pinkerton's National De-

tective Agency, Inc., to watch over the stock of merchandise of the plaintiff. Salvage then filed a cross-complaint against Pinkerton, alleging that it had employed the defendant, Pinkerton, to provide watchmen on plaintiffs' premises; that Pinkerton did furnish such watchmen which were on duty until after the second fire; and that if Salvage owed plaintiffs any duty to watch over and protect plaintiff's building, the same duty was owed to Salvage by Pinkerton. The prayer of the cross-complaint was that Salvage have judgment against Pinkerton for any judgment which the plaintiffs might recover against it. Upon trial of the case to the court without a jury, all parties rested at the conclusion of plaintiffs' evidence. The court entered judgment against Salvage in the sum of $51,937.04 which was the value of the building at the time of the second fire, together with other expenditures. Judgment was in favor of Pinkerton on the complaint and cross-complaint. Salvage has appealed from that judgment.

The evidence established that the warehouse in question was owned by the plaintiff, R. M. Pate, and had for many years been occupied by the plaintiff, the Davis and Shaw Furniture Company. Generally, it was used to store a large stock of furniture. On August 3, 1948, the building with its contents was damaged by fire. On August 4th, Davis and Shaw, with representatives of the companies who insured the merchandise stored in the warehouse, entered into a contract with Salvage whereby the damaged furniture was to be turned over to Salvage and was to be taken from the warehouse by them and put in the best possible condition and sold in the interests of those concerned. Salvage was to deduct from the gross sales its necessary expenses and the usual commission.[2] At about the time that Salvage

---

2. The material portion of the contract reads:

"This Memorandum Witnesseth: That whereas, the stock described as insured by policies issued to Davis & Shaw Furn. Co. has been damaged by fire occurring on or about the 3d day of August, 1948.

"Whereas, it is to the benefit of all who may have an interest in the stock contained in building located at 1343–49

13th Street, Denver, Colo., that same be handled with as little delay as possible without waiting to determine the respective ownership or interests or liabilities under policies purporting to insure same.

"It is hereby mutually understood and agreed, that all the remains of said stock shall be turned over to the Underwriters Salvage Company of New York, to be by

assumed charge of the damaged merchandise in the warehouse under its contract, the Denver Fire and Police Departments withdrew their men from the scene of the fire. It was then agreed that Salvage would furnish necessary guards for the premises. It made arrangements with Pinkerton to guard the property and guards were placed thereon immediately.

The warehouse was a four story building. When the August 3rd fire occurred it burned through the upper floors causing their collapse. The merchandise, which included a large amount of carpeting, carpet padding, and mattresses, fell from the upper floors and created a large inverted cone shaped pile on the first floor. It was impossible for the fire department to completely extinguish the fire in this pile and it continued to smolder. When Salvage took charge of removing the damaged merchandise from the building it knew of the smoldering fire and the danger of fresh outbreaks. On numerous occasions during the salvaging process the smoldering fire became active and representatives of Salvage either extinguished these fires or called the fire department to do so. Its guards, among other duties, were instructed to keep a lookout for fires and they did, and when fires occurred they called the fire department on each occasion. These outbreaks were preceded by considerable smoke before a blaze would appear.

Early in the morning of August 14, 1948, while one of the guards was on duty, smoke was seen coming from the building, and shortly thereafter flames appeared. Where the guard was at the time is not shown, but neither he nor any other employee of Salvage observed the smoke or fire or called the fire department. This was done by a passerby. The fire department arrived at the scene about two minutes after it was notified. By that time the fire was out of control, and it completely destroyed that portion of the building in which the furniture was stored. The evidence is without dispute that had the fire department been called when the smoke first appeared it could have controlled the fire without substantial damage to the building.

The trial court found that Salvage took possession and control over the goods in the warehouse and remained in possession until the outbreak of the second fire; that it agreed to furnish guards to be used in and around the building; and that on various occasions these guards discovered and reported fires that occurred to the fire department.[3]

them put in best possible order and sold in the interest of whom it may concern. The proceeds of such sale, less the Salvage Company's expenses (which shall include necessary traveling expense and maintenance of the officers or agents of the Company) of handling the same, plus usual % commission on gross sales shall be held by them as Trustee until loss is adjusted and then turned over by them to the parties to whom said proceeds belong."

3. Findings 5 and 6 read as follows:
"V. Pursuant to this agreement, Salvage took possession and control over the goods in the warehouse and remained in possession until the outbreak of the second fire on August 14th. They made some repairs to the interior of the building to expedite the removal process and as a precautionary measure to insure the safety of persons removing the merchandise.
"The contents of the building, in part, consisted of carpeting, padding, and similar material and after the fire of August 3rd, piles of this type goods remained smoldering, and created a fire hazard. In fact, from August 4th until August 9th or 10th, the Fire Department was called back eight or nine times to extinguish fires that developed within the smoldering areas."
"VI. During the conference between R. E. Pate, Jr., and Salvage, there was some discussion as to guards and the representative of Salvage stated they would furnish the guards. The evidence is not conclusive as to the nature of the agreement between the parties. Suffice to say, for a disposition of this case, two guards—later reduced to one—from the Pinkerton Agency were used in and around the building; and the guards did on various occasions report the outbreak of small fires to the Fire Department. The use of the guards was known to R. E. Pate, Jr."

The trial court also found that, prior to the outbreak of the last fire, smoke could be seen inside and above the building in such quantities as to be readily apparent to a casual observer; and that a reasonably prudent observer could have discovered the danger of the outbreak of the fire in time to notify the fire department, so that it would have been able to reach the warehouse in time to extinguish the fire before it got out of control. The trial court concluded that under the circumstances Salvage had a legal duty to take necessary and reasonable precaution to prevent the merchandise under its control from causing harm to others.[4] It further concluded that under the existing conditions a reasonably prudent man was bound to foresee the injury that would result if a fire was permitted to break out in the merchandise in the building.

It is stoutly contended that the theory upon which the court decided the case was not an issue therein; and that it was not raised by the pleadings but was injected into the case by the court itself. It is said that the only issue tried was whether Salvage undertook to watch over and protect plaintiffs' property. Even if this were true, the trial court was not precluded from rendering judgment as it did because the evidence introduced without objection clearly showed that Salvage had assumed possession and control of a smoldering fire which was likely to break out into a conflagration at any time and destroy the property of the plaintiffs. This evidence raised the issue of liability under the circumstances. As we said in Kilbourn v. Western Surety Co., 10 Cir., 187 F.2d 567, 571, "The new rules of Federal Procedure were adopted to unshackle the practice of law in the courts from the straight jacket of technical rules of pleading and procedure. The rules were liberalized to the end that there might be more speedy and complete adjudication of a controversy between all interested parties without regard to technicalities and mere formal technical rules." Under Rule 15(b), 28 U.S.C.A., a liberal provision is made for amendments to conform the pleadings to the evidence and in such cases it is the duty of the court to consider issues raised by evidence received without objection even though no formal application is made to amend. El Paso Electric Co. v. Surrency, 10 Cir., 169 F.2d 444; Simms v. Andrews, 10 Cir., 118 F.2d 803; Pasquel v. Owen, 8 Cir., 186 F.2d 263; Ruud v. American Packing & Provision Co., 9 Cir., 177 F.2d 538. This is also the law in Colorado. Cady v. Fraser, 122 Colo. 252, 222 P.2d 422. In Toy v. Rogers, 114 Colo. 432, 165 P.2d 1017, 1018, the court said: "Under the provisions of rule 15(b), R.C.P.Colo., notwithstanding the complaint was based on contract, when evidence was received without objection clearly establishing plaintiffs' right under section 19, the plaintiffs could then amend their complaint to conform to the proof either at the trial or subsequent to judgment, and their failure to amend the complaint at all would not inure to the benefit of defendant nor affect the result of the trial if defendant impliedly consented to the trial of this issue. Swift & Co. v. Young, 4 Cir., 107 F.2d 170, 171; Continental Illinois National Bank & Trust Co. v. Ehrhart, 6 Cir., 127 F.2d 341; Fifth Avenue Bank v. Hammond Realty Co., 7 Cir., 130 F.2d 993; Rogers v. Union Pacific Railroad Co., 9 Cir., 145 F.2d 119; Franklin v. Columbia Terminals Co., 8 Cir., 150 F.2d 667; Scott v. Baltimore & O. R. Co., 3 Cir., 151 F.2d 61." Ordinarily the court is not limited to theories of counsel but has the duty to determine the issues which are presented by the evidence properly before it. Newton Oil Co. v. Bockhold, 115 Colo. 510, 176 P.2d 904; Hodge v. Terrill, 123 Colo. 196, 228 P.2d 984.

We think, however, from the pleadings, the pretrial conference, the opening state-

---

4. The court stated that the "duty did not arise, in the true sense of the word, by virtue of the contract with Davis and Shaw. No more so than any contract of sale creates a duty in the vendee to see that the property is not used in a negligent manner. Possession and control create the duty—not the means by which possession is attained."

ments and the evidence[5] introduced that one of the theories of liability relied upon by plaintiffs was that Salvage, having taken possession and control of certain damaged merchandise in which there was a smoldering fire, and having undertaken to watch over it for the purpose of preventing theft and the outbreak of a smoldering fire, was

---

5. Richard E. Pate, Jr., testified:

"Q. Where were these outbreaks?—A. They were in the center of the shaded section there, the red section.

"Q. What type of material was smoldering and smoking?—A. Carpet padding, mattresses, carpeting.

"Q. And I understand that the stock which you had turned over, or were turning over to them, was still smoldering and smoking. The fire in that had not been entirely extinguished; is that what you mean?—A. Yes.

"Q. Do you know whether they had any subsequent trouble with that merchandise because it was still smouldering?—A. I don't believe I understand.

"The Court: Ask him the question again, Mr. Reporter. (Question read.)

"A. Well, they had to remove certain things, like a mattress that was causing a lot of smoke, or a roll of hair padding, carpet padding, because of the smoke.

"Q. (By Mr. Denious) Did the Fire Department ever come back to the building after August 3rd?—A. Yes.

"Q. When?—A. Well, a total of eight or nine times, I believe, in the first three or four days following the fire, the main fire.

"Q. Why did they come back there?—A. To put out these recurring small fires that were causing a lot of smoke.

"Q. What was burning in these small fires?—A. The merchandise that had ordinarily been damaged by water and fire in the main section of the building—as I said, padding, mattresses.

"Q. The merchandise that was being worked over and salvaged by the Underwriters Salvage Company?—A. The merchandise they were working on and removing, yes.

"Q. Who called the Fire Department back?—A. The Salvage Company's foreman, if it was during the daytime, or the watchman after hours, during the night.

"Q. Do you know whether any other measures were taken to keep down the fires in the building after the August 3rd fire?—A. Yes, after the Fire Department had withdrawn its major equipment —I think this was three or four days following the first fire—they connected up a fire hose and ran it some distance from our building into the building and put a clamp on it. It was full of water, with a clamp."

\* \* \* \* \* \*

"The Court: Did you have any conversation with them about that they were guarding against fire?

"The Witness: I don't believe that question was ever discussed, no.

"Q. (By Mr. Denious) At the time when these arrangements were made for watchmen, were you aware of the condition of the merchandise down there as being still on fire?—A. Yes.

"Q. And did you make any independent arrangements to have outbreaks of those fire reported?—A. No.

"Q. Why didn't you?—A. Because the salvage people and the watchmen were in charge there. It was their responsibility.

"Q. Did you know that they were reporting those outbreaks?—A. Yes.

"Q. And you knew that the Fire Department was being called on a number of occasions?—A. Yes."

William Spahn, a Denver Fire Department Captain testified:

"Q. Did you also fight the Davis and Shaw fire of August 14th, the second fire?—A. Yes, sir.

"Q. During the interval, between August 4th, 1948 and August 14th, did you ever go back to the Davis and Shaw warehouse?—A. Quite a few times. I think around 10 or 11 times.

"Q. What was the reason you went back there?—A. Smouldering fires that were in the buried materials, and the watchman there notified us when there was any smoke or anything appeared to be afire. He's notify the Fire Department and we would go and investigate and dig it out and put it out.

"Q. Was there any particular part of the building where these fires broke out? —A. Well, most of them seemed to be located there on the first floor where the largest part of the furniture and carpeting and things were piled up in a heap there. It was all buried in one pile there. When the floors collapsed, everything seemed to pile up in one floor there, or the first floor.

"Q. What types of materials did you find smouldering and burning when you were called?—A. Well, mostly it was in roll carpeting and carpet matting and mattresses.

"Q. What did you do in order to extinguish those fires?—A. They were usually buried and we would first have to dig

<br>

bound to perform this undertaking as a reasonably prudent person would under the circumstances, so that the property watched over or the property of others would not be injured. In short, the claim is a tort action based upon the fact that Salvage was in possession and control of a dangerous fire situation, and having undertaken to watch it, was, under the circumstances, negligent in not discovering the fire before it became uncontrollable and in failing to call the Denver Fire Department to extinguish it.[6] The

down and locate the sources of smoke and flame and then drench them with water.

"Q. Did you drench them with water on each of these 10 or 11 visits you made?—A. That's right. We would wet that area thoroughly where this fire was originating.

"Q. During these calls between August 4 and August 14th, did you make any inspection of the interior of the warehouse?—A. Well, only the normal inspection you would make on responding with an apparatus. We would completely go through the building, wherever it was possible to get to it, and survey the building to see if there was any other sparks or smouldering fire.

"Q. How did you learn about this second fire of August 14th, 1947?—A. A gentleman driving his car over the Fourteenth Street—."

6. From the cross-examination of the Fire Department Chief and Captain, it does not appear that Salvage was misled as to the theory on which the case was tried. On cross-examination, the Chief testified:

"Q. In other words, Chief, if you were there just a moment before that broke into flame, you could have put it out?—A. I believe so, yes. It's a daily experience with us.

"Q. I see. But you, of course, don't know, you have no idea how long that may have been smouldering?—A. Well, my arrival at a fire is quite a bit later than the company's.

"Q. I see. So you know nothing about that part of it?—A. The actual beginning of it, of course not."

Cross-examination of the Captain was in part as follows:

"Q. So that even though you kept putting water on this stuff, it kept breaking out in fires at different times?—A. There was buried materials there and in that type of material it's very hard to get to the seat of that fire and put it out.

"Q. Now, you have testified that in your opinion this fire on the 14th had been smouldering for about an hour before it suddenly broke out in flames?—A. It would have to be smouldering quite some time to gain the headway that it had.

"Q. As a matter of fact, Captain, when you talk about smouldering, in other words, you mean that there were sparks or something down there and that it was just kind of working around there and finally breaks out?—A. That's right.

"Q. That's true of all these things, and I suppose that this fire, for instance, of August 9th, which was six days after the original fire, had been smouldering all those six days down there?—A. It's possible.

"Q. There had to be something down there for it to have started up finally, didn't there?—A. That's right.

"Q. So that over this period of days it would be smouldering clear down there; is that right?—A. Yes, sir.

"Q. And would finally break out?—A. Yes.

"Q. And, of course, over this six-day period there wasn't smoke all the time coming out?—A. No, just small wisps. We would go over there a lot of times and it would be just a faint wisp of smoke and we were showed where it was coming from and we would dig around and wet it down.

"Q. And then again it would start and you would have to come back?—A. That's right.

"Q. As a matter of fact, it was so bad at times that you would have to come back within a period of three hours after you had wetted it down, you would be back again in three hours for another one?—A. That's right.

"Q. Some other spot had been smouldering and finally came out; is that it?—A. That's right.

"Q. And it is pretty hard to tell, isn't it, whether or not, a short notice ahead of time would have been sufficient to put the fire out? It would have been so far down in there and going so strong that even if you had gotten there a few minutes earlier you still would not have been able to extinguish it?—A. Well, it would have showed more smoke if it had been raging underneath. It was just smouldering.

"Q. You think it was just smouldering?—A. Right.

"Q. Until it broke out?—A. That's right.

"Q. In other words, just smouldering until the fire broke?—A. Yes."

court referred to the smoldering fire as a "fire hazard" to indicate the existence of an imminently dangerous situation.

It is apparent from the evidence that when Salvage took possession and control of the smoldering mass of merchandise, it knew that if the merchandise was not carefully watched and guarded for new outbreaks of fire and that if methods were not promptly taken to extinguish such outbreaks, that the fire would spread with serious consequences to the property of plaintiffs and others. Under these conditions the law imposes upon those in possession and control of such a dangerous condition the duty to exercise prudence and due care to avoid injuries to others and holds them liable for damages resulting from the breach of such duty. "The duty of vigilance to prevent injury has its source in the law applicable to human relations rather than in a narrow conception of privity." 38 Am.Jur., Negligence, Secs. 14, 22, 85. Milwaukee & St. Paul Railway Co. v. Kellogg, 94 U.S. 469, 24 L.Ed. 256; Bushnell v. Telluride Power Co., 10 Cir., 145 F.2d 950; Boynton v. Fox Denver Theatres Inc., 121 Colo. 227, 214 P.2d 793; John Mouat Lumber Co. v. Wilmore, 15 Colo. 136, 25 P. 556; Gute v. Halstead, 75 Cal. App.2d 369, 170 P.2d 1016; Arneil v. Schnitzer, 173 Or. 179, 144 P.2d 707; Annotations 42 A.L.R. 783, 792; 111 A.L.R. 1140, 1148. We cannot say that there is no substantial evidence to support the conclusions of the trial court or that they are clearly erroneous.

The trial court held that neither the plaintiffs nor Salvage was entitled to recover against the defendant, Pinkerton. The plaintiffs did not appeal from that part of the judgment in favor of Pinkerton. In its cross-complaint, Salvage alleged that Pinkerton was under contract with it to furnish watchmen's service at plaintiffs' premises and was providing such service at the time of the second fire on August 14, 1948; that if the plaintiffs suffered any loss with regard to that watchman's service for which Salvage or Pinkerton or both were liable, Pinkerton is primarily liable; and that Salvage should have judgment against Pinkerton for any amount which the plaintiffs might recover against Salvage. No evidence was introduced to prove the allegations of the cross-complaint, and we agree with the trial court that there is insufficient evidence in the record to sustain a recovery by Salvage against Pinkerton.

Judgment is affirmed.