549 P.2d 423 (1976)
AMERICAN WOODMEN'S LIFE INSURANCE COMPANY, a corporation, Plaintiff-Appellee,
v.
The SUPREME CAMP OF the AMERICAN WOODMEN, a Fraternal Benefit Association, Defendant-Appellant.
No. 75-032.
Colorado Court of Appeals, Div. 3.
February 5, 1976.
Rehearing Denied February 26, 1976.
*424 Joseph P. Jenkins, P. C., Estes Park, for plaintiff-appellee.
Smart & Smart, P. C., Thomas D. Smart, Wood, Ris & Hames, P. C., Stephen E. Connor, Denver, for defendant-appellant.
Selected for Official Publication.
VanCISE, Judge.
The Supreme Camp of the American Woodmen (the society) appeals from directed verdicts and judgments entered thereon in favor of plaintiff American Woodmen's Life Insurance Company (the company) on its claim for $83,178.93 and against the society on its two counterclaims for $117,000 and for an accounting. The society also appeals from a judgment entered upon a jury verdict for the company on an unrelated claim for $5,010.42. We affirm in part and reverse in part.
The society has been in existence as a domestic fraternal benefit society since 1901. Its major function over the years has been the providing of life insurance for its members.
In 1966, in compliance with what is now § 10-14-115(2), C.R.S.1973, pertaining to conversion of fraternal benefit societies into stock life insurance companies, a plan of conversion was prepared by the directors, adopted by the membership of the society, and approved by the insurance commissioner. This plan called for the creation of a company to which the society would transfer its insurance assets and liabilities, and detailed how the members of the society were to participate in the new arrangement. The company's articles of incorporation were filed December 2, 1966, the society ceased transacting life insurance business as of March 31, 1967, and the company commenced its operations the following day. A certificate of authority to assume the society's life insurance operations was issued to the company by the insurance commissioner. The company's first board of directors consisted exclusively of society members, and the head of the society was the first president of the company. The society continued in existence as a social fraternal order.
The society transferred its insurance in force to the company, and the company assumed the liabilities incident thereto and issued assumption certificates to each insured. It was assumed by both parties that the insurance in force totaled $22,975,142, and assets in the amount of $8,045,418 were transferred to fund the reserve requirements therefor. The society transferred $225,000 in additional assets to serve as a special reserve or surplus (the society's "Reserve for Fluctuation in Mortality," untapped since World War I days), and then paid $375,000 more for the purchase of all of the initially issued common stock of the company. Of this latter payment, $250,000 was allocated to paid-up capital and $125,000 to paid-in and contributed surplus.
In 1969, Crusaders Life Insurance Company of Kansas was merged into the company. Shareholders of Crusaders received company stock in exchange for their former Crusaders stock in an aggregate amount exceeding that owned by the society and its former policyholders.
In July of 1972, the company filed suit against the society. It alleged in its first claim that at the time of the conversion the society had transferred and the company had assumed $83,178.93 in liabilities for accrued but unpaid installments of old-age endowment policies which were discovered subsequent to conversion and for which equivalent assets were not transferred (the $83,000 claim). It contended that this amount was therefore owing from the society. The company's second claim, unrelated to the first, was for return of *425 the $5,010.42 purchase price of a U.S. Treasury bond allegedly purchased from the society in 1969 and not delivered by it to the company (the $5,000 claim).
The society filed two counterclaims against the company. One was for $117,000 allegedly transferred to the company over and above the reserve requirements for the amount of insurance in force at the time of conversion (the $117,000 counterclaim). On discovery of the overage in 1967, the company reduced its reserve by that amount and, pursuant to an agreement between the company and the insurance commissioner, set aside the excess as unassigned surplus funds for a period ending May 1, 1973. None of the money was expended during the period. The agreement with the commissioner did not specify what disposition was to be made of these funds thereafter, and the society maintains that the $117,000 should have been returned to it at the end of the period.
In the other counterclaim, the society alleged that, before the establishment of the company, the regular payments made to the society by its members included both insurance premiums and monies for the society's general fund, these latter being dues to finance the noninsurance functions of the society. It asserted that, when the company took over collection of premiums, the company alsoinadvertently or otherwisecollected the dues as well, and has not remitted and has refused to make any accounting to the society for any of these monies retained by it, despite repeated demands therefor. The society asked for an accounting as to the funds owing to it and for judgment against the company for the amount determined to be due.

I.
The company's $83,000 claim and the society's $117,000 counterclaim are both grounded on the premise that rights and obligations in each party were created by the society's plan of conversion. Both are based on bookkeeping errors not discovered until after conversion. The company contends, and the society denies, that in addition to the assets and funds transferred at the conversion, the society is required to transfer to the company additional assets sufficient to cover $83,000 in after-discovered liabilities to policyholders. The society's position, opposed by the company, is that the society is entitled to a refund of $117,000 later determined to be in excess of the amount required for the policy reserves because of an overstatement of the amount of insurance in force. There was evidence which would support the substance and amount of both claims, but neither party proved a right to recover from the other.
The trial court directed a verdict for the company on its $83,000 claim; it directed a verdict against the society on its $117,000 counterclaim. The court's granting of one and denying the other cannot be reconciled. If the claim is good, so is the counterclaim. But unless the adoption and implementation of the plan in some manner created rights and obligations in the parties requiring later adjustments in the assets originally transferred, neither can be upheld.
The plan as presented to and approved by the members of the society and by the insurance commissioner provided that:
"The Society proposes to convert its insurance operation . . . by creating American Woodmen's Life Insurance Company . . . and by transferring its insurance assets and liabilities to that corporation . . . ."
Then followed statements about the March 31, 1967, effective date, the minimum capital and minimum surplus figures, the allocation of the stock purchase price thereto, the initial directors being directors of the society, the retention by the society of its noninsurance related assets and liabilities, and the continuation of its fraternal activities. The remaining provisions of the plan dealt with how the members of the society whose policies were in force were to participate in the divisible surplus and *426 other funds of the society related to the insurance operation.
When the plan was presented to the society's membership for consideration, it was, by its own express terms, a proposal. It was not an offer or agreement by anyone to do anything. When it was approved by the membership, it changed from a proposal into an official but internal declaration of intent, an authorization to the society's officers and directors to set up an insurance company in accordance with its provisions. Adoption of the proposal did not convert it into a contract; there was no second party involved, no offer or acceptance, no exchange of consideration; no promissory commitments; its terms were not sufficiently definite to make it enforceable even if there were a party in existence with the right to enforce it. There were no words contained therein which constitued any obligation to or by the insurance company. Nor did the commissioner's approval create a contract where none existed before. Absent a contract, neither had a right of recovery from the other. See Denver Truck Exchange v. Ferryman, 134 Colo. 586, 307 P.2d 805; Newton Oil Co. v. Bockhold, 115 Colo. 510, 176 P.2d 904; Morath v. Perkins, 86 Colo. 101, 278 P. 611.
As of the conversion date, the society did transfer assets to the company in exchange for which the company assumed certain liabilities and issued shares of its stock to the society or policyholders. However, there was no evidence of any terms, conditions or contingencies agreed upon incident to this transaction other than what actually took place. Neither can claim from this situation any additional rights against the other.
In Bergeson v. Life Insurance Corp. of America, 265 F.2d 227 (10th Cir.), cert. denied, 360 U.S. 932, 79 S.Ct. 1452, 3 L.Ed. 2d 1545, a stockholder instituted a derivative suit on behalf of an insurance company against the officers and promoters thereof on a claim that the promoters had been guilty of misconduct as a result of which the capital of the company was impaired from its inception. The court held that:
"Whatever improprieties there may have been, the result was not a legal injury to the corporation. If stock purchasers, policyholders or creditors were injured by the misconduct of the defendants, the remedy lies in appropriate actions by them."
We adopt the rationale of Bergeson. Incorporation and capitalization of the company did not create a legal relationship between it and the society out of which could arise the kind of reciprocal rights and obligations contended for here. Since neither side alleges fraud, violation of fiduciary duty, or bad faith by the other, and since there was neither a contract nor any other relationship between the parties upon which the instant claims might be based, there can be no recovery on either the $83,000 claim or on the $117,000 counterclaim. Neither constituted a cause of action on which relief may be granted to the parties here involved.

II.
The society's counterclaim for an accounting as to the monthly fraternal dues payments collected by the company from policyholders formerly insured by the society is not related to the initial incorporation and capitalization of the company. It is based on an alleged course of conduct by the company in the operation of the insurance business after the conversion.
Considerable testimony and a number of exhibits were offered by the society and refused by the trial court. While we do not agree with the court's conclusion that the plan of conversion constituted a contract which was complete and unambiguous as to this issue, we concur with the result. This counterclaim was an action for an accounting, and the prerequisites essential to such an action were not met in the evidence presented or offered.
"The moving party is not entitled to an accounting as of course." Hartman *427 v. Elias, 41 N.M. 392, 69 P.2d 929. Usually a demand for an accounting and a refusal to comply with the demand are necessary prerequisites to be pleaded and proved. Wiegardt v. Becken, 8 Wash.2d 568, 113 P.2d 60, 143 A.L.R. 1208. Here, demand and refusal were pleaded but not proved. There was no evidence introduced or even offered to show a demand by the society for the dues allegedly collected by the company at any time during the five year period from the conversion date to the time when the counterclaim was filed. Nor was there any showing of any refusal by the company prior to the filing of its answer to that counterclaim.
Further, nowhere in the mass of documents and voluminous testimony introduced or offered was there any thing proving that any particular policyholder paid to the company a premium which included the contested surcharge or that any local lodge made any such payment to the company on behalf of any of its members. Nor is there anything showing the receipt of dues by the company. The evidence is even in conflict as to what the amount of the dues was supposed to be. The most that can be said for this evidence is that it consisted of projections based on speculation or guesswork without any proof or probable inferences. Under these circumtances, where the counterclaimant had the burden to prove his right to an accounting, a judgment for the society could not be justified and a directed verdict against it was proper. See Bennett v. Gardner, 133 Colo. 33, 291 P.2d 705.

III.
There was sufficient evidence to support the jury verdict in favor of the company on its $5,000 claim against the society. The judgment entered thereon is accordingly affirmed.

IV.
In view of the positions taken on the matters discussed above, it is not necessary to consider the other alleged errors raised on this appeal.
The judgments on the $5,000 claim, the $117,000 counterclaim, and the counterclaim for an accounting are affirmed. Although the society did not move for a directed verdict or dismissal at the trial or on this appeal, this court has jurisdiction of the whole subject, and can thus resolve the entire controversy and end the litigation here by granting the relief to which the party is entitled. Vierra v. Fontes, 135 Cal. 126, 66 P. 241; see Griffith v. Cooper, 145 Colo. 439, 359 P.2d 360, and Spears Free Clinic & Hospital for Poor Children v. State Board of Health, 122 Colo. 147, 220 P.2d 872. Accordingly, the judgment on the $83,000 claim is reversed and the cause is remanded to the trial court with directions to dismiss the $83,000 claim.
RULAND and BERMAN, JJ., concur.