David **David PATTERSON, Philip McCoy, Donald Kanzler, and Shirley Kanzler, Plaintiffs–Appellants,**

v.

**BP AMERICA PRODUCTION COMPANY, f/k/a Amoco Production Company, Defendants–Appellees.**

No. 04CA2344.

Colorado Court of Appeals, Div. III.

May 4, 2006.

---

Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2005.

Charles Carpenter, Denver, Colorado; Law Offices of George A. Barton, P.C., George A. Barton, Kansas City, Missouri, for Plaintiffs–Appellants.

Holland & Hart, LLP, Scott S. Barker, Marcy G. Glenn, Denver, Colorado, for Defendants–Appellees.

TAUBMAN, J.

In this putative class action concerning royalty payments on the sale of natural gas, plaintiffs, David Patterson, Philip McCoy, Donald Kanzler, and Shirley Kanzler (Royalty Owners), appeal the trial court's summary judgment in favor of defendant, BP America Production Company (BP), formerly known as Amoco Production Company (Amoco). We reverse and remand for further proceedings.

In 1970 and 1972, the Royalty Owners entered into lease agreements with Amoco which obligated Amoco to pay them royalties for natural gas extracted from their wells. In November 1997, Amoco sold its interests in the natural gas leases to another company, and BP, as successor to Amoco, has not paid royalties to the Royalty Owners since January 1998.

On December 19, 2003, the Royalty Owners filed a complaint alleging that BP underpaid royalties under the leases between 1971 and November 1997 by using the "netback" method instead of the percentage of sale price method provided for in the leases.

Under the netback method, a proportionate share of the costs incurred to make the gas marketable is deducted before royalties are paid. In this case, BP deducted fees and charges for gathering, dehydration, compression, transportation, fuel, treatment, and processing before paying royalties to the Royalty Owners. The leases, however, provided for royalty payments of one eighth of the price received on the sale of the gas at the first commercial market.

BP moved for partial summary judgment, asserting that the Royalty Owners' complaint was untimely under the six-year statute of limitations in § 13–80–103.5(1)(a), C.R.S. 2005. The trial court granted BP's motion and held that the Royalty Owners' claims were time-barred.

Shortly thereafter, the trial court granted the Royalty Owners' unopposed motion for entry of final judgment. This appeal followed.

### I. Statute of Limitations

■ The Royalty Owners contend that the trial court erred in holding that § 13–80–108(4), C.R.S.2005, instead of § 13–80–108(6), C.R.S.2005, determined the accrual date for their royalty claims. We agree.

We review a trial court's order granting summary judgment de novo. *Cyprus Amax Minerals Co. v. Lexington Ins. Co.*, 74 P.3d 294 (Colo.2003). A summary judgment order must be reversed if a review of the record shows that a dispute of material fact remains. *Redmond v. Chains, Inc.*, 996 P.2d 759 (Colo. App.2000).

#### A.

Section 13–80–103.5(1)(a) establishes a six-year statute of limitations for:

All actions to recover a liquidated debt or an unliquidated, determinable amount of money due to the person bringing the action, all actions for the enforcement of rights set forth in any instrument securing the payment of or evidencing any debt, and all actions of replevin to recover the possession of personal property encumbered under any instrument securing any debt . . . .

Section 13–80–108, C.R.S.2005, determines the date a cause of action will accrue. *Harrison v. Pinnacol Assurance*, 107 P.3d 969 (Colo.App.2004).

Section 13–80–108(4) states that a "cause of action for debt, obligation, money owed, or performance shall be considered to accrue on the date such debt, obligation, money owed, or performance becomes due." However, § 13–80–108(6) states that a "cause of action for breach of *any* express or implied contract, agreement, warranty, or trust shall be considered to accrue on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence." (Emphasis added.)

■ When construing statutes, we conduct a de novo review and look first to the plain language, always striving to give effect to the General Assembly's intent and chosen legislative scheme. *McGee v. Hardina*, 140 P.3d (Colo.App. 2005). In the absence of a clear expression of legislative intent to the contrary, a statute of limitations specifically addressing a particular class of cases will control over a more general or catch-all statute of limitations. *Mortgage Invs. Corp. v. Battle Mountain Corp.*, 70 P.3d 1176 (Colo.2003).

■ However, where there is a substantial question as to which of two or more statutes of limitations should apply, that doubt should be resolved in favor of the statute containing the longer limitations period. *Reg'l Transp. Dist. v. Voss*, 890 P.2d 663 (Colo.1995) (citing *Thiel v. Taurus Drilling Ltd.*, 218 Mont. 201, 212, 710 P.2d 33, 40 (1985)).

■ Whether a statute of limitations bars a particular claim is usually a question of fact, but if the undisputed facts clearly show that the plaintiff had, or should have had, the requisite knowledge as of a particular date, the issue may be decided as a matter of law. *Sulca v. Allstate Ins. Co.*, 77 P.3d 897 (Colo. App.2003).

Here, the parties agree that the applicable statute of limitations is the six-year statute of limitations found in § 13–80–103.5(1)(a). However, they disagree on which statute governs the date the Royalty Owners' claims began to accrue.

The Royalty Owners argue that § 13–80–108(6) is the applicable accrual provision and therefore, that the claims began to accrue when they became aware of BP's breach of the lease agreements in November and December 2003. BP argues that § 13–80–108(4) is the applicable accrual provision and consequently, that the claims began to accrue on the various dates it allegedly underpaid the royalties, ending in January 1998, the date the last royalty payment was made after it sold its interest in the leases. We agree with the Royalty Owners.

The plain language of §§ 13–80–108(6) and 13–80–108(4) is broad and overlapping. Section 13–80–108(4) applies to causes of action for debt, obligation, money owed, or performance. This language could include virtually every conceivable breach of contract claim, rendering § 13–80–108(6), which applies to any express or implied contract, agreement, warranty, or trust, superfluous and meaningless. In virtually every case involving an al-

leged breach of contract, one party claims that the other breached the agreement between them by failing to pay a debt, obligation, or money owed, or by failing to perform the particular service promised.

BP argues that § 13–80–108(4) is the applicable accrual provision because its language tracks the language in § 13–80–103.5(1)(a). Similarly, BP argues that § 13–80–108(6) is inapplicable here because its language tracks that of the three-year statute of limitations found in § 13–80–101(1)(a), C.R.S. 2005. We disagree.

Although the statute of limitations in § 13–80–103.5(1)(a) applies to actions to recover a "liquidated debt or an unliquidated, determinable amount of money due," and § 13–80–108(4) governs the accrual of causes of action for "debt, obligation, money owed, or performance," we are not persuaded that the language in these statutes is parallel; at most, the language is similar. If the General Assembly had intended to link these two statutes, it could have done so by drafting parallel language or by expressly stating in § 13–80–103.5(1)(a) that § 13–80–108(4) is the governing accrual provision.

Likewise, § 13–80–108(6) is not exclusively linked to § 13–80–101(1)(a), despite the fact that § 13–80–108(6) governs the accrual of "[a] cause of action for breach of any express or implied contract" and the statute of limitations in § 13–80–101(1)(a) applies to "[a]ll contract actions." If the General Assembly had intended to link these statutes, it could have drafted parallel rather than similar language or specifically stated in the text of § 13–80–101(1)(a) that § 13–80–108(6) is the governing accrual provision.

Thus, although § 13–80–108(4) could apply here, it is not because the plain language of that provision limits it to the "specific" type of contract action in § 13–80–103.5(1)(a), because it "tracks" the plain language of that statute. Rather, the potential applicability of § 13–80–108(4) is merely based on the fact that its language is sufficiently broad to encompass the alleged underpayment of royalties.

On the other hand, § 13–80–108(6) extends to any express or implied contract, agree-ment, warranty, or trust, as mentioned above. Therefore, because the Royalty Owners' royalty claims are based on the alleged breach of lease agreements, the language in § 13–80–108(6) also seems to apply here.

Accordingly, we cannot rely on the rule of specificity in *Mortgage Investments Corp., supra,* to determine which statutory accrual provision applies because neither statutory accrual provision is more specific than the other.

Although the parties cite several cases, none of them specifically addresses the issues before us. BP cites *Green Tree Financial Servicing Corp. v. Short,* 10 P.3d 721 (Colo. App.2000), *Interbank Investments, L.L.C. v. Vail Valley Consolidated Water District,* 12 P.3d 1224 (Colo.App.2000), and *Aull v. Cavalcade Pension Plan,* 988 F.Supp. 1360 (D.Colo.1997), for its proposition that § 13–80–108(4) is the applicable accrual provision.

Although a division of this court in *Green Tree* held that § 13–80–108(4) governed the accrual of the statute of limitations in § 13–80–103.5(1)(a) for an action for replevin of a motor home, it did not compare that accrual provision with § 13–80–108(6). Therefore, *Green Tree* does not address the dispute between these two overlapping accrual provisions.

In *Interbank,* a division of this court held that § 13–80–108(4) was the applicable accrual provision for a breach of contract action for the quarterly reimbursement of costs associated with the construction of two water distribution systems subject to the statute of limitations in § 13–80–103.5(1)(a). Again, however, that division did not consider the overlap between § 13–80–108(4) and § 13–80–108(6) either. Thus, *Interbank* is also inapposite.

In *Aull,* the court addressed a claim for violations of the Employee Retirement Income Security Act and held that § 13–80–108(4) was the accrual provision most analogous to the six-year statute of limitations in § 13–80–103.5(1)(a). Nonetheless, the court also arrived at this conclusion without addressing the overlap between § 13–80–108(4) and § 13–80–108(6). Consequently, *Aull* is not determinative.

The Royalty Owners rely on *Auto–Trol Technology Corp. v. J. Fox, Inc.*, 24 Fed. Appx. 986 (10th Cir. No. 00–1412, Jan. 10, 2002)(not selected for publication), because in that case, the Tenth Circuit Court of Appeals held that § 13–80–108(6) governed the accrual of the six-year statute of limitations for royalty underpayments under § 13–80–103.5(1)(a). *Auto–Trol* is an unpublished case that may be cited in Colorado only if it relates to a matter of state law that has not been addressed by a published opinion. 10th Cir. R. 36.3(B)(1); *Waskel v. Guar. Nat'l Corp.*, 23 P.3d 1214 (Colo.App.2000). Although no published cases address the issue before us, we decline to adopt the Tenth Circuit's conclusion in *Auto–Trol* because, as in *Green Tree, Interbank,* and *Aull,* the court did not compare the two overlapping accrual provisions.

Having found no case that specifically addresses how to resolve a substantial dispute between two or more equally applicable statutory accrual provisions, we turn to the supreme court's reasoning for the rule in *Voss.* In *Voss,* the supreme court held that the longer statute of limitations should prevail in a dispute between two equally applicable statutes of limitation because "statutes of limitation are in derogation of a presumptively valid claim." *Reg'l Transp. Dist. v. Voss, supra,* 890 P.2d at 668; *see also Dawson v. Reider,* 872 P.2d 212 (Colo.1994)(statutes of limitation are in derogation of a presumptively valid claim; therefore longer period of limitations prevails where two statutes of limitation are arguably applicable).

While the conflict in this case is between two statutory accrual provisions, and not two statutes of limitations, we conclude that the rationale for the rule in *Voss* is equally pertinent here. Because an argument for a particular statutory accrual provision is part of a statute of limitations defense, it is also made in derogation of presumptively valid claims. Furthermore, as shown here, a dispute between two statutory accrual provisions, as applied, can affect the outcome of a case in the same way as a dispute between a longer and a shorter statute of limitations.

BP's argument that § 13–80–108(4) is the applicable accrual provision has the same

practical effect as an argument for a shorter statute of limitations in this case. If § 13–80–108(4) applies, the Royalty Owners' claims accrued on the various dates BP allegedly underpaid the royalties, ending in January 1998, the date the last royalty payment was made. Therefore, under that accrual provision, all of the Royalty Owners' claims for alleged underpayments occurring prior to the date the complaint was filed (December 19, 2003) are automatically time-barred because the parties agree that the applicable statute of limitations for this case is six years.

On the other hand, the Royalty Owners' argument that § 13–80–108(6) is the applicable accrual provision has the same practical effect as an argument for a longer statute of limitations. Section 13–80–108(6), as applied here, provides that the royalty claims arguably did not start to accrue until the period between November and December 2003, when the Royalty Owners claim they became aware of the alleged underpayments. Therefore, if that accrual provision applies, the Royalty Owners' claims are not time-barred if they can prove that they did not discover or had no reason to discover the alleged underpayments until no more than six years before the date of the filing of the complaint.

■ Thus, because statutory accrual provisions, as applied to a particular case, can preclude parties from litigating a claim in the same manner that statutes of limitations can, we conclude that a dispute between equally applicable statutory accrual provisions must be resolved in favor of the provision which, as applied, provides for the later accrual date. Accordingly, here, § 13–80–108(6) is the applicable accrual provision for the six-year statute of limitations in § 13–80–103.5(1)(a), and the trial court erred in holding that § 13–80–108(4) was the applicable accrual provision.

### B.

■ BP argues in the alternative that, even if § 13–80–108(6) is the applicable accrual provision, the Royalty Owners discovered or should have discovered the alleged breach at least fifteen years ago when they signed oil and gas division orders and trans-

fer orders indicating BP's intent to employ the netback method for calculating royalty payments. We disagree.

■ An oil and gas division order is a contract of sale to the purchaser of oil or gas which directs the purchaser to make payment for the value of the products taken in the proportions set out in the order. 8 Howard R. Williams & Charles J. Meyers, *Oil and Gas Law* 289 (2005). An oil and gas transfer order directs a purchaser under a division order to pay another person a specified share in the oil or gas produced. Williams & Meyers, *supra,* at 1121.

As mentioned above, § 13–80–108(6) states that a cause of action for breach of any express or implied contract, agreement, warranty, or trust shall begin to accrue on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence.

The division and transfer orders here contained the following relevant covenant:

> Settlements for gas shall be based on the net proceeds at the wells after deducting a fair and reasonable charge for compressing and making it merchantable and transporting if the gas is sold off the property. Where gas is sold subject to regulation by the Federal Power Commission or other governmental authority, the price applicable to such sale approved by order of such authority shall be used to determine the net proceeds at the wells.

BP argues that this covenant constituted notice of its intent to employ the netback method for calculating royalty payments, and therefore, that the Royalty Owners knew or should have known of the alleged breach no later than 1988, the date the last division order was signed. We conclude that the terms of the division orders, together with contrary evidence, create a disputed issue of material fact because the Royalty Owners argue that they did not know and could not be expected to have known of the alleged underpayments until the period between November and December 2003.

The gas covenant quoted above sets forth alternative procedures for calculating royalty payments. The first section states that roy-alties will be calculated on the net proceeds at the wells, while the second section states that the royalties will be based on a fixed price set by the Federal Power Commission or other governmental authority, if the gas is subject to federal regulation.

Indeed, the first provision of the gas covenant seems to indicate BP's intent to employ a netback method for calculating royalty payments unless natural gas prices are subject to federal regulation. Therefore, even though all but one of the Royalty Owners signed the division orders at a time when BP was paying gas royalties based on federally-established ceiling prices, they arguably knew or should have known that BP would switch to a netback method for calculating royalties once natural gas prices became deregulated.

However, we conclude that the gas covenant did not provide the Royalty Owners with actual notice of BP's use of the netback method. All but one of the Royalty Owners signed the division and transfer orders five to ten years before natural gas prices became deregulated. Therefore, at the time the Royalty Owners signed the orders, the terms of the gas covenant provided them with notice that the netback method would be triggered only if the federal government decided to deregulate gas prices. Thus, the terms of the gas covenant could have provided the Royalty Owners with actual notice of BP's use of the netback method only if BP subsequently notified them of the federal deregulation and its intent to begin using the netback method.

We further conclude that there is a disputed issue of fact as to whether the Royalty Owners should have known of the netback methodology based on the division and transfer orders.

Here, the Royalty Owners presented evidence in opposition to the summary judgment motion that BP concealed relevant and material facts from them. First, they allege that, after federal deregulation began, BP's monthly royalty checks were accompanied by royalty reports that consistently represented the royalty payments as being determined based on the gross volume of gas sold times the actual price received. The Royalty Own-

ers allege that the royalty reports never reflected any deductions associated with the netback method. Second, the Royalty Owners allege that BP periodically mailed brochures to them, beginning in the mid–1980s, that purported to explain how it was calculating the royalties. According to the Royalty Owners, these brochures did not disclose the deduction of any costs associated with the netback method. Lastly, the Royalty Owners claim that BP never informed them of the federal deregulation of natural gas prices.

Accordingly, we conclude that a disputed issue of material fact exists and remand to the trial court for a jury determination as to whether the Royalty Owners should have discovered the alleged royalty underpayments under the terms of the division and transfer orders on or before the date natural gas prices became deregulated.

## II. Fraudulent Concealment

■ The Royalty Owners contend that the trial court erred in holding that their evidence of BP's fraudulent concealment of material facts was not sufficient to defeat BP's summary judgment motion and that this concealment did not toll the statute of limitations. We agree.

At the outset, we note that this issue will arise on remand only if the jury determines that the Royalty Owners knew or should have known that the alleged underpayments began to occur six years or more prior to the filing of the complaint. If on remand the jury determines that the Royalty Owners knew or should have known of the alleged underpayments no more than six years prior to the filing of the complaint, the trial court need not address the issue of fraudulent concealment.

■ The supreme court has consistently recognized fraudulent concealment as a basis for tolling statutes of limitation. *Smith v. Boyett*, 908 P.2d 508 (Colo.1995). The elements necessary for proving fraudulent concealment and thereby tolling a statute of limitations are: (1) the concealment of a material existing fact that in equity and good conscience should be disclosed; (2) knowl-

edge on the part of the party against whom the claim is asserted that such a fact is being concealed; (3) ignorance of that fact on the part of the one from whom the fact is concealed; (4) the intention that the concealment be acted upon; and (5) action on the concealment resulting in damages. *Smith v. Boyett, supra.*

Here, the Royalty Owners presented substantial evidence in support of their argument that BP concealed its use of the netback method from them. As mentioned above, the Royalty Owners allege that BP concealed its use of the netback method in its royalty reports and brochures. The Royalty Owners also submitted copies of internal reports allegedly demonstrating that BP purposefully concealed these facts, despite the recommendations of a concerned group of BP employees.

Additionally, the Royalty Owners allege that BP never informed them of a royalty underpayment lawsuit filed against it by the Colorado State Land Board involving identical royalty language in lease agreements. Lastly, the Royalty Owners claim that BP never informed them of a class action filed against it by well owners in La Plata County for royalty underpayments resulting from the use of the netback method.

Accordingly, if the jury finds on remand that the Royalty Owners' claims began to accrue at the time they signed the division orders, it will still need to apply the factors set forth in *Smith* to determine whether the statute of limitations was tolled by BP's alleged fraudulent concealment.

## III. Laches

The Royalty Owners also contend that the trial court erred in holding that their claims for accounting were barred by the doctrine of laches. We agree in part.

■ The doctrine of laches allows a court to deny a party equitable relief. The elements of the doctrine of laches are: (1) full knowledge of the facts; (2) unconscionable or unreasonable delay in the assertion of an available remedy; and (3) intervening reliance by and prejudice to another. *Keller*

*Cattle Co. v. Allison,* 55 P.3d 257 (Colo.App. 2002).

An accounting claim is generally equitable in nature. *Virdanco, Inc. v. MTS Int'l,* 820 P.2d 352 (Colo.App.1991). The resolution of equitable issues rests in the sound discretion of the trial court. *Hildebrand v. Olinger,* 689 P.2d 695 (Colo.App.1984). Although an accounting is an extraordinary remedy, it may be ordered if the plaintiff is unable to determine how much, if any, money is due him or her from another. *Andrikopoulos v. Broadmoor Mgmt. Co.,* 670 P.2d 435 (Colo.App.1983).

Here, the trial court based its finding that the Royalty Owners' accounting claims were barred by the doctrine of laches on the language in the gas and oil transfer and division orders. As stated above, a disputed issue of material fact remains as to whether these orders placed the Royalty Owners on notice of BP's alleged royalty underpayments. Accordingly, whether the doctrine of laches applies to bar the Royalty Owners' accounting claims would depend on the jury's finding on remand regarding this disputed issue.

If on remand the jury finds that the language of the gas and oil transfer and division orders does not preclude the Royalty Owners' claims for breach of contract, the trial court must then determine whether the Royalty Owners are entitled to an accounting under *Andrikopoulos v. Broadmoor Management Co., supra.*

The Royalty Owners state in their complaint that they are unable to determine the precise amount of monetary damages. Here, the alleged royalty underpayments occurred on a monthly basis for over fifteen years and are the result of numerous deductions for complex variable costs such as dehydration, compression, transportation, fuel, treatment, and processing. Moreover, the variable costs were deducted from the fluctuating price of natural gas, further complicating the calculation of monetary damages.

Furthermore, BP has exclusive control of the information required to make these calculations so it is almost inconceivable that the Royalty Owners would be able to determine the total amount of the alleged underpayments without a full accounting by BP.

However, BP argues that, even if the doctrine of laches does not apply, and presumably, even if the Royalty Owners are entitled to an accounting under *Andrikopoulos,* it still is not obligated to provide an accounting under *American Woodmen's Life Insurance Co. v. Supreme Camp of American Woodmen,* 37 Colo.App. 311, 549 P.2d 423 (1976).

In *American Woodmen's Life Insurance Co.,* a division of this court held that a moving party is not entitled to an accounting as a matter of course because generally, a demand for an accounting and a refusal to comply with the demand are necessary prerequisites to be pleaded and proved. In response, the Royalty Owners argue that a pre-suit demand is not an essential element of a claim for an accounting if it is clear that the demand would have been futile. *See Van Schaack v. Phipps,* 38 Colo.App. 140, 558 P.2d 581 (1976). We conclude that neither case is applicable here.

The thrust of the Royalty Owners' complaint concerns BP's alleged breach of contract for underpaying royalties. Thus, the Royalty Owners' accounting claim is ancillary to their breach of contract claim because its main purpose is to facilitate an accurate calculation of damages once a breach of contract is found. Therefore, it would be unreasonable to preclude the Royalty Owners' accounting claim simply because they did not request one from BP before the underlying breach of contract claim was adjudicated, as suggested by *American Woodmen's Life Insurance Co. v. Supreme Camp of American Woodmen, supra.*

Furthermore, that case is not analogous to the facts here because it concerned a fraternal benefit society's demand for an accounting of assets transferred to a life insurance company. Thus, we decline to follow the decision in *American Woodmen's Life Insurance Co. v. Supreme Camp of American Woodmen, supra;* and, therefore, do not need to address the decision in *Van Schaack v. Phipps, supra.*

Accordingly, on remand, if the Royalty Owners prevail on their breach of contract

claim, the trial court must determine whether the accounting claim is barred by the doctrine of laches. If the accounting claim is not barred by the doctrine of laches, the trial court must then decide whether the Royalty Owners are entitled to an accounting under *Andrikopoulos v. Broadmoor Management Co.*, *supra*.

The judgment is reversed and the case is remanded for further proceedings in accordance with this opinion.

Judge LOEB and Judge STERNBERG * concur.