DAVIS CATTLE CO., INC.,
Plaintiff-Appellee,

v.

The GREAT WESTERN SUGAR COM-
PANY, Defendant-Appellant.

No. 75–1426.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted March 23, 1976.

Decided Sept. 20, 1976.

Rehearing Denied Oct. 26, 1976.

Jeremiah C. Collins, Washington, D. C. (John W. Vardaman, Jr., Pierce H. O'Donnell, Williams, Connolly & Califano, Washington, D. C., and Jerry C. Daniel, Houtchens, Houtchens & Daniel, Greeley, Colo., of counsel, on the brief), for plaintiff-appellee.

Kenneth L. Starr, Denver, Colo. (Hardin Holmes, Ireland, Stapleton, Pryor & Holmes, Denver, Colo., and Ivan Irwin, Jr., Shank, Irwin, Conant, Williamson & Grevelle, Dallas, Tex., on the brief), for defendant-appellant.

Before McWILLIAMS, BREITENSTEIN and DOYLE, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a contract dispute between Great Western Sugar Company and its sugar beet growers concerning the so-called initial payment due the growers under the 1974 sugar beet contract. The trial court, sitting without a jury, found that in making the initial payment the Company breached the contract in two particulars, resulting in an initial payment to the growers which was substantially less than that called for by the contract. After allowing certain credits, the trial court entered judgment for the growers in an amount of $9,736,066. Additionally, the trial court determined that the growers were entitled to moratory interest on the amount thus found to be due and owing the growers under the contract, such interest being in an amount of $3,237,475. Accordingly, judgment was entered in favor of the growers and against the Company in an aggregate amount of $12,973,541. The Company appeals the judgment.

As indicated, this was a trial to the court. In total accord with both the mandate and spirit of Rule 52(a), Fed.R.Civ.P., the trial court made detailed findings of fact and conclusions of law, and its 32-page memorandum opinion appears as *Davis Cattle Co., Inc. v. Great Western Sugar Company*, 393 F.Supp. 1165 (D.C.Colo.1975). The reader of this opinion is directed to the trial court's memorandum opinion for the background facts out of which the present controversy arises. Such will not be developed, to any appreciable degree, in the present opinion. We shall accordingly proceed on the premise that the reader of this opinion is thoroughly conversant with the trial court's findings and conclusions, and its reasoning in support thereof, its computation of damages, and its comprehensive analysis of the Colorado law bearing on the matter of moratory interest.

### I. Breach of Contract

The claim of the sugar beet growers is based on an alleged breach of a contract negotiated between the Company and the marketing associations, the latter, by law, representing the sugar beet growers in this

particular geographic area. We would note that this is a class action, the class consisting of some 4,000 growers with approximately 900 class members requesting that they be excluded from the class. The contract here involved is referred to as the 1974 contract and it governed the parties for the 12-month period beginning October 1, 1974, and ending on September 30, 1975. Under the terms of the 1974 contract the beet growers agreed to grow and deliver to the Company their 1974 crop of sugar beets.

Pursuant to the terms of the contract, the sugar beet growers are not paid a flat sum for their product, but rather are paid on a profit sharing basis. Accordingly, the contract sets out a formula whereby the beet growers receive approximately 64% of the net profit or "returns" received by the Sugar Company from its sale of refined sugar during the 12-month period beginning on October 1, 1974, and ending on September 30, 1975. The 1974 contract required the Company to make an initial payment on November 20, 1974, for the beets delivered through November 4, 1974. We are advised that the annual harvest is substantially accomplished between the first week of October and November 4. The 1974 contract also required payment in final settlement during October 1975, which is the earliest time that the exact amount of the *total* payment could be determined. The Company may under the contract make interim payments, and it customarily has made an interim payment in April of each year.

We are here concerned with the initial payment due the growers on November 20, 1974, for beets delivered the Company between October 1, 1974, and November 4, 1974. We would here note that the instant action was instituted on November 22, 1974, and was tried in the early part of 1975, at a time when the *total* payment ultimately due the growers was not, and could not have been, finally determined. As indicated, the gist of the growers' complaint is that their initial payment, due November 20, 1974, was substantially less than that called for by the contract. The initial payment, and more particularly the amount

thereof, was governed by paragraph 6 of the contract. That paragraph reads as follows:

"6. Payment for Sugarbeets. Subject to the deductions and assignments hereinafter authorized, *an initial payment shall be made by the Company on or before the 20th day of November for beets delivered prior to the 5th day of November,* and an initial payment shall be made on or before the 15th day of each calendar month thereafter for beets delivered during the previous calendar month for which an initial payment has not theretofore been made *which shall be at the highest rate per ton that the Company may deem to be justified taking into consideration anticipated returns from the sale of sugar and the sugar content of beets.* Further payments may be made by the Company at such times and in such amounts as the Company may deem to be justified by the aforesaid factors and the quantities of sugar sold. Final settlement in accordance with the terms of this contract, if any amounts be due after credit of all payments theretofore made by the Company to the Grower, shall be made on or before October 25, 1975, unless the Company receives assurance from the United States Department of Agriculture that it is going to report an 'actual raw sugar cost' in which event final settlement hereunder shall be made on or before ten days after the reporting of said 'actual raw sugar cost' or October 25, 1975, whichever is later." (Emphasis added.)

The trial court found, in effect, that in determining the initial payment due the growers on November 20, 1974, the Company has breached the contract in two particulars. The trial court first found that in determining the initial payment due the growers on November 20, 1974, the Company "had promised to take into consideration its anticipated returns for the sale of sugar" and that "it did not do so." Alternatively, the trial court also found that although under the contract the Company had some discretion, the Company had "an absolute duty to exercise complete good faith in the exercise of that discretion," and

that in this regard the Company "was guilty of fraud or such gross mistake as necessarily implies bad faith or a failure to exercise an honest judgment in fixing the amounts of the initial payment." It is the Company's position in this court that both of these findings are "clearly erroneous." We do not agree.

■ At the heart of this controversy is the fact that in the latter part of 1974 the sugar market was, as described by several witnesses, "volatile," and in fact the price of refined sugar had skyrocketed. As indicated above, under the contract the price per ton of sugar beets to be paid the growers for their 1974 crop was tied to the price received by the Company per hundredweight for the sugar realized from that crop. Not knowing with certainty as of November 1974 just what it would realize from its sale of sugar during the ensuing months and continuing until September 30, 1975, the Company in determining the amount of the initial payment due on November 20, 1974, necessarily had to do some estimating and predicting. It was of course to the business advantage of the Company not to "overpay" in the initial payment. If there were overpayment, the Company would be hard pressed to recover the overpayment from the several thousand growers covered by the contract. Additionally, the Company borrowed much of the money it used to make this initial payment to the growers, and the less money paid the growers meant less borrowing, thereby effecting a substantial savings to the Company in interest payments. In any event, admittedly, there was under the contract a considerable degree of discretion granted the Company in its determination of the amount of the initial payment to be paid the growers on November 20, 1974. However, this was not an unfettered discretion. Under paragraph 6 of the 1974 contract the initial payment should be at the highest rate per ton that the Company deems justified "taking into consideration anticipated returns from the sale of sugar and the sugar content of beets." Additionally, as the Company concedes, in exercising its discretion under paragraph 6 of the contract, it must do so in "good faith." So, in fixing the initial payment, the Company *must* consider its anticipated returns from the sale of sugar, and furthermore the discretion granted the Company under paragraph 6 *must* be exercised in good faith toward the growers.

■ The trial court found that in determining the initial payment the Company failed to consider and give recognition to its anticipated returns for the 1974 crop. Alternatively, the trial court also found that the Company, in failing to take into consideration its anticipated return for the sugar sold by it under the 1974 contract, breached its duty to exercise "complete good faith" in the exercise of its admitted discretion. As a reviewing court we are bound by these findings, unless we are prepared to hold that such are "clearly erroneous." Rule 52(a), Fed.R.Civ.P. A finding of fact by a trial court is "clearly erroneous" when a reviewing court, on a study of the entire record, "is left with the definite and firm conclusion that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948). Our study of the matter does not lead us to the conclusion that the trial court, in effect, missed the boat. We concede that it is a matter upon which reasonable minds might well differ, but we simply do not have any "definite and firm conviction that a mistake has been committed." Accordingly, we conclude that the trial court's findings that the Company breached the contract in two particulars should not be disturbed by us on appellate review.

The trial court in its memorandum opinion sets forth at considerable length the basis for its finding that there had been a breach of contract. We do not propose to repeat here the trial court's careful analysis of the entire matter. It is sufficient to note that the trial court found, and its memorandum opinion sets forth fully the evidentiary matter upon which it relied for such finding, that the Company virtually ignored, or at the least failed to fully recognize and give weight to, its anticipated returns from the sale of the sugar realized from the 1974 sugar beet crop.

As concerns the trial court's additional finding that in exercising its discretion under paragraph 6 of the contract, the Company failed to exercise an "honest judgment," there is the suggestion here that in so holding the trial court misread and misapplied *Dittbrenner v. Myerson,* 114 Colo. 448, 167 P.2d 15 (1946). We do not think such to be the case. In our view the trial court did not overextend *Dittbrenner* and in actuality relied to a much greater degree on *Empson Packing Co. v. Clawson,* 43 Colo. 188, 95 P. 546 (1908). The latter case is ample authority that though the Company had some discretion, it must nonetheless exercise an honest judgment in fixing the initial payment. Indeed the Company concedes such and simply argues that the evidence does not support a finding of bad faith. We do not agree. As indicated in the trial court's memorandum opinion, there was evidence which supported the trial court's finding that the Company had not acted with good faith toward its growers.

## II. Damages

The parties agreed below that if the trial court found that the Company had breached the 1974 contract, the trial court should in such event determine the dollar amount of the initial payment which the Company should have made, and the amount of the damages would be the difference between what was paid by the Company on November 20, 1974, and what it should have paid. As above mentioned, the price per ton of sugar beets to be paid the growers by the Company was tied into the price per hundredweight the Company was receiving, and was anticipating to receive, from its sale of the sugar recovered from the beets, and the contract had a formula for converting dollars per hundredweight of refined sugar into dollars per ton of beets. The Company, in its computation of the amount due the growers as an initial payment, used as a starting point the figure of $14.35 per hundredweight of sugar as being its anticipated return from the sale of sugar, which converted into a payment to the growers at the rate of $26.25 per ton of sugar beets. And the $26.25 per ton figure

was the figure used by the Company in fixing its initial payment.

The trial court concluded that the Company's reasonably anticipated return on the sale of sugar should have been approximately $28 per hundredweight, instead of $14.35, and the $28 figure was then converted into a payment to the growers of approximately $51 per ton of sugar beets, as opposed to the $26.25 per ton actually paid by the Company in its initial payment. The Company here complains that there is no evidence to support the figures used by the trial court in its computation of damages. We disagree and are of the firm view that the figures used by the trial court are not clearly erroneous, and on the contrary are well within the range of the testimony.

As referred to above, the Company in making its initial payment to the growers did not, for obvious reasons, want to "overpay" the growers. Accordingly, it had been the custom for the Company to pay the growers by way of initial payment approximately 85% of its anticipated returns for the year. Indeed, the 85% figure, or one akin thereto, had been written into prior contracts between the parties, though such provision was not contained in the 1974 contract. In any event, the trial court observed that the Company had previously paid approximately 80–85% of its anticipated yearly return as its initial payment. With that in mind, the trial court first found that the Company should have determined its initial payment on the basis of an anticipated return of approximately $40 per hundredweight of refined sugar, and then the trial court allowed the Company to "hedge" by only paying at the rate of 70% of the $40 figure, as opposed to the customary 85%. This extra "hedging" was a recognition by the trial court that the sugar market at the time was volatile and not as stable as had previously been the case. Using, then, the figure of approximately $28 per hundredweight, i. e., 70% of $40 per hundredweight, the trial court proceeded to compute damages on this basis. Without further developing this matter, we believe the figures used by the trial court in deter-

mining damages were well within the range of the evidence and we find no error in its computation thereof.

### III. Moratory Interest

This in our view is perhaps the most important issue on appeal. The additional amount found by the trial court to be due and owing the beet growers from the Company by way of initial payment on November 20, 1974, would in the normal course of events have been paid the growers in any event no later than October 20, 1975, since the total payment eventually to be paid the growers for its year's crop was, under the contract, a stated percentage of the return actually realized by the Company in a given year. So, in a sense, this was a claim by the growers for monies they should have received on November 20, 1974, but did not receive at that particular time, which would be offset by monies subsequently received by the growers from the Company under the contract, and which would in all probability approximate the amount of the deficiency. It was in this setting that the trial court further held that the growers were also entitled to moratory interest at the rate of 11.5% on the amount which should have been paid by the Company on November 20, 1974, and was not, such interest to run until the date of judgment, subject to credits for such sums as had been paid the growers by the Company between November 20, 1974, and the date of the judgment, which was April 12, 1975. The trial court further ordered that interest on the judgment itself would run at the statutory rate of 6% from the date of judgment. On appeal the Company strenuously objects to the allowance by the trial court of moratory interest on the amount which the trial court found the Company should have paid the growers on November 20, 1974, but had not. It is said that this is an unliquidated claim, and that Colorado law does not permit an award of interest on an unliquidated claim.

■ In awarding moratory interest the trial court agreed with the Company that under Colorado law statutory interest cannot be awarded on an unliquidated claim. '73 C.R.S., 5–12–102. The trial court reasoned, however, that such did not preclude the awarding of moratory interest, i. e., interest by way of damages and not as a creature of statute. Such is in line with our recent decision in *Quad Construction, Inc. v. Wm. A. Smith Contracting Co.,* 534 F.2d 1391 (10th Cir. 1976), where we recognized that there are judicially created exceptions in Colorado to the general rule that the allowance of interest is a creature of statute. In allowing prejudgment interest, the trial court recognized that just compensation for the victim is a fundamental principle of damages, and that where money has been wrongfully withheld, it is only fair that the victim receive interest on the money thus withheld.

■ The trial court in allowing moratory interest on the amount that the Company should have paid the growers on November 20, 1974, but had not, reviewed quite fully the Colorado law on the subject and concluded that Colorado had adopted the moratory interest concept. We agree. The trial court relied heavily on *Bankers Trust Co. v. International Trust Co.,* 108 Colo. 15, 113 P.2d 656 (1941), which case was itself cited with approval by this court in *Phillips Petroleum Co. v. Oldland,* 187 F.2d 780, *cert. denied,* 342 U.S. 816, 72 S.Ct. 30, 96 L.Ed. 617 (1951). The trial court's reliance on these cases was in our view well founded. We agree with the trial court that Colorado law permits an award of moratory interest in a situation of this type.

■ Complaint is also made of the trial court's ruling that there be moratory interest at the rate of 11.5% per annum. The Company argues that at the most the interest rate should have been set at the statutory rate of 6% per annum. *Bankers Trust Co., supra,* declares that the true measure of moratory interest is the *benefit* to the wrongdoer, and that the statutory rate should be used only in the absence of proof as to the benefit accruing to the wrongdoer as the result of his wrongful detention. In the instant case the evidence was that the

Company had to borrow much of the money which it used to make the initial payment to the growers. In this regard the trial court noted that the Company had obtained a $75 million line of financing at the rate of 11.5% and that by underpaying the growers the Company had saved itself interest charges on amounts it would have otherwise been forced to borrow. While the testimony on this matter was perhaps in some degree of conflict, we cannot say that the trial court's use of that figure was clearly erroneous. On the contrary, the figure used by the trial court was in our view within the range of the record.

*Quad Construction, Inc. v. Wm. A. Smith Contracting Co.*, 534 F.2d 1391 (10th Cir. 1976) does not limit interest in the instant case to 6%. There interest was allowed under the statute. Here interest is allowable under a judicially created exception to the interest statute. Moreover, in *Quad* there was apparently no evidence as to the benefit accruing to the wrongdoer.

In sum, then, this case boils down to a determination as to whether the trial court erred in awarding moratory interest, and whether its several findings were clearly erroneous. We conclude that the trial court correctly perceived the Colorado law on the matter of moratory interest. And in our view the trial court's findings are amply supported by the record. A reading of the trial court's memorandum opinion indicates quite clearly that the trial court had a good grasp of the issues and was indeed in complete command of the case.

Judgment affirmed.