2015 COA 28

David PATTERSON, Phillip McCoy, and William Schaefer, Plaintiffs-Appellants and Cross–Appellees,

v.

BP AMERICA PRODUCTION COMPANY, f/k/a Amoco Production Company, Defendant–Appellee and Cross–Appellant.

Court of Appeals No. 13CA1972

Colorado Court of Appeals, Div. VI.

Announced March 12, 2015

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S. 2014.

214

Law Offices of George A. Barton, P.C., George A. Barton, Kansas City, Missouri; Jones & Keller, P.C., G. Stephen Long, Denver, Colorado; Charles Carpenter, Denver, Colorado for Plaintiffs–Appellants and Cross–Appellees.

Wheeler Trigg O'Donnell LLP, Scott S. Barker, N. Reid Neureiter, Kendra N. Beckwith, Nathan P. Murphy, Denver, Colorado for Defendant–Appellee and Cross–Appellant.

Opinion by JUDGE FOX

¶1 Plaintiffs, David Patterson, Phillip McCoy, William Schaefer, and approximately 4000 royalty owners (collectively Royalty Owners), brought a class action against BP America Production Company, formerly Amoco Production Company, (collectively BP), alleging the underpayment of royalties on the sale of natural gas. Following a jury trial, the district court entered judgment in favor of Royalty Owners. Royalty Owners now appeal the court's pretrial order granting BP's C.R.C.P. 56(h) motion and denying Royalty Owners' moratory interest request.[1] BP cross-appeals, alleging multiple errors. We affirm.

## I.  Background

¶2 In the early 1970s, Royalty Owners entered into lease agreements with BP, obligating BP to pay Royalty Owners royalties in exchange for natural gas extracted from their wells in Weld or Adams Counties and processed at BP's Spindle or Wattenberg processing plants—all located within the Denver–Julesburg (DJ) Basin. As applicable here, these lease agreements provided that BP would pay Royalty Owners "1/8 of the market value of such gas at the mouth of the well; if said gas is sold by [BP], then as royalty 1/8 of the proceeds of the sale thereof at the mouth of the well."[2] The lease agreements did not expressly authorize BP to deduct from the royalty payments any post-production costs incurred in making the gas marketable after its extraction.

¶3 Royalty Owners also signed oil and gas division and transfer orders, which stated, in pertinent part:

Settlements for gas shall be based on the net proceeds at the wells after deducting a fair and reasonable charge for compressing and making it merchantable and transporting if the gas is sold off the property. Where gas is sold subject to regulation by the Federal Power Commission [FPC] or other governmental authority, the price applicable to such sale approved by order of such authority shall be used to determine the net proceeds at the wells.[3]

¶4 This section of the division and transfer order identifies alternative procedures to calculate Royalty Owners' royalty payments. As interpreted by another division of this court in *Patterson v. BP America Production Co.*, 159 P.3d 634, 640 (Colo.App.2006), *rev'd*, 185 P.3d 811 (Colo.2008), the first sentence provided that royalties would be calculated based on the net proceeds at the wells after deducting any post-production costs incurred in making the gas marketable. The second sentence, however, provided that, as long as gas was federally regulated, royalties would be based on a fixed price set by the FPC or other government entity. *Id.*

¶5 When most Royalty Owners signed the lease agreements and division and transfer orders, gas prices were federally regulated, and Royalty Owners were paid at the maximum lawful price, or the price specified by the lease agreements. In the 1980s, the process of deregulating the natural gas market began, and BP gradually changed how Royalty Owners' royalties were calculated. BP began to employ a netback methodology to calculate royalty payments, whereby BP deducted from Royalty Owners' royalty

1.  The term "moratory interest" is used in different ways by various courts. We use the term here to refer to the increased interest rate allowed by section 5–12–102(1)(a), C.R.S. 2014. We refer to the eight percent rate referenced in section 5–12–102(1)(b) as the "statutory interest rate."

2.  This reflects the language contained in one of the lease agreements that was admitted into evidence and referred to by the parties at trial. Neither party has contested the use of this lease agreement.

3.  Again, this reflects the language contained in one of the division and transfer orders that was admitted into evidence and referred to by the parties at trial. Neither party has contested the use of this division and transfer order. As we discuss below, in *BP America Production Co. v. Patterson*, 185 P.3d 811, 815 (Colo.2008), the supreme court left untouched a court of appeals ruling that the division and transfer orders did not give Royalty Owners actual notice that post-production costs would be allocated proportionately, and that a disputed issue of material fact existed regarding whether BP fraudulently concealed the deductions. *See also Patterson v. BP Am. Prod. Co.*, 159 P.3d 634, 640 (Colo.App. 2006), *rev'd*, 185 P.3d 811.

checks a proportionate share of the post-production costs incurred to make the gas marketable, including transportation, processing, and refinement costs.

¶ 6 Royalty Owners' royalty statements did not disclose these deductions. Royalty Owners claim that BP consistently concealed the changed royalty calculations and misrepresented to Royalty Owners the deduction of post-production costs. Royalty Owners also assert that BP never informed them that any of their wells had been deregulated. Indeed, Royalty Owners contend that they did not become aware of the deductions until shortly before they sued.

¶ 7 In 2003, Royalty Owners sued BP for breach of contract, alleging that BP underpaid their royalties between January 1, 1986, and December 1, 1997 (Class Time Period). Royalty Owners also moved to certify the action as a class action. In response, BP filed a motion for partial summary judgment, objecting to the class certification because Royalty Owners' claims were allegedly barred by a six-year statute of limitations. *See* § 13–80–103.5(1)(a), C.R.S. 2014. Royalty Owners responded that BP fraudulently concealed the material facts giving rise to their claims (i.e., the post-production cost deductions), thereby tolling the applicable statute of limitations.

¶ 8 BP contended that it did not fraudulently conceal the deductions, in part, because the lease agreements and division and transfer orders provided Royalty Owners with notice that BP intended to deduct post-production costs from Royalty Owners' royalties.

¶ 9 The district court granted BP's motion, ruling that Royalty Owners' claims were time-barred. A division of the court of appeals reversed in *Patterson*, 159 P.3d 634, on the ground that Royalty Owners' claims did not accrue until the date they discovered or should have discovered BP's post-production cost deductions.

¶ 10 The division also held that the division and transfer orders "did not provide the Royalty Owners with actual notice of BP's use of the netback method." *Id.* at 640. Rather, the orders stated that BP would deduct post-production costs only if the federal government decided to deregulate gas prices. *Id.* Thus, to claim that Royalty Owners had actual notice of any deductions, BP would need to demonstrate that it notified Royalty Owners of deregulation and of its decision to begin using the netback method to deduct post-production costs. *Id.* The division also concluded that there remained a disputed issue of material fact regarding whether Royalty Owners "should have known" about BP's use of the netback method to calculate deductions. *Id.*

¶ 11 The supreme court reversed the court of appeals in *BP America Production Co. v. Patterson*, 185 P.3d 811, and remanded the case, holding that Royalty Owners' claims accrued on the date their royalties became due, not on the date they discovered the alleged breach of contract. *Id.* at 815. The supreme court, however, left untouched the court of appeals' rulings that the division and transfer orders did not give Royalty Owners actual notice of BP's use of the netback method, that a disputed issue of material fact existed regarding whether BP fraudulently concealed the deductions it made, and whether the statute of limitations had been equitably tolled as a result. *See id.*

¶ 12 On remand, Royalty Owners filed a renewed motion for class certification under C.R.C.P. 23(b)(3). Central to certification was the disputed (and undecided) issue of whether Royalty Owners could prove the elements of their fraudulent concealment claim on a class-wide basis to toll the statute of limitations. The district court held an evidentiary hearing, found Royalty Owners' fraudulent concealment and equitable tolling claims persuasive, and certified the class.

¶ 13 BP again objected and filed an interlocutory appeal. The court of appeals affirmed the certification in *Patterson v. BP America Production Co.*, 240 P.3d 456, 469 (Colo.App.2010), concluding that BP's limited evidence regarding several isolated Royalty Owners was insufficient to defeat Royalty Owners' fraudulent concealment claim. BP sought certiorari review in the supreme court, and the court affirmed in *BP America Production Co. v. Patterson*, 263 P.3d 103, 106 (Colo.2011). The supreme court noted

that the district court's certification order remained "subject to proof later discovered or presented at trial on the merits" regarding individual Royalty Owners. *Id.* at 114.

¶ 14 Following the second remand, BP deposed nine Royalty Owners and discovered that several class members were gas industry participants who used the netback methodology themselves and who acknowledged that the division and transfer orders notified Royalty Owners of BP's intent to use such methodology. Based on this new information, BP moved to decertify the class, arguing that these class members should have known about the royalty deductions and that Royalty Owners' fraudulent concealment and equitable tolling claims therefore failed on a class-wide basis. The district court denied the motion.

¶ 15 After the second remand, BP also moved for a pretrial determination of a question of law pursuant to C.R.C.P. 56(h) on Royalty Owners' claim for moratory interest, under section 5–12102(1)(a), C.R.S. 2014, on all unpaid royalties. The district court agreed with BP and held that Royalty Owners were not entitled to moratory interest.

¶ 16 At the conclusion of trial, a jury found that BP breached the lease agreements by underpaying royalties and that BP fraudulently concealed the underpayments, thereby tolling the statute of limitations. The jury awarded Royalty Owners $7,941,809.23 in damages.

¶ 17 BP timely filed a C.R.C.P. 59(a)(2) motion for a judgment notwithstanding the verdict (JNOV) or a new trial, which the district court denied. In response to Royalty Owners' C.R.C.P. 59(a)(4) motion, the district court amended the judgment to add $32,273,817 in statutory prejudgment interest, pursuant to section 5–12–102(1)(b), bringing the total judgment to $40,215,626.23.

¶ 18 Royalty Owners now appeal the district court's pretrial grant of BP's C.R.C.P. 56(h) motion and its denial of moratory interest under section 5–12–102(1)(a). BP cross-appeals from the judgment, contending that the district court erred by (1) denying BP's motions for a directed verdict and JNOV, (2)

failing to properly instruct the jury, and (3) declining to decertify the Royalty Owners' class.

## II. C.R.C.P. 56(h) Motion

¶ 19 Royalty Owners contend that the district court erred in granting BP's C.R.C.P. 56(h) motion and concluding that Royalty Owners were not entitled, as a matter of law, to prejudgment interest under section 5–12–102(1)(a), at a rate greater than the eight percent statutory rate authorized in section 5–12–102(1)(b). We discern no error.

### A. Standard of Review

¶ 20 We review an order granting a C.R.C.P. 56(h) motion de novo. *Henisse v. First Transit, Inc.,* 247 P.3d 577, 579 (Colo. 2011); *In re Estate of McCreath,* 240 P.3d 413, 417 (Colo.App.2009). A determination of a question of law under C.R.C.P. 56(h) is proper "[i]f there is no genuine issue of any material fact necessary for the determination of the question of law." *See Henisse,* 247 P.3d at 579. The nonmoving party is entitled to all favorable inferences, and we resolve any doubt as to the existence of a genuine issue of material fact in the nonmoving party's favor. *Id.; McCreath,* 240 P.3d at 417–18.

### B. Section 5–12–102(1)(a)

¶ 21 Section 5–12–102(1)(a) specifies that where, as here, money or property is wrongfully withheld, "interest shall be an amount which fully recognizes the gain or benefit realized by the person withholding such money or property." This language, which allows for a higher interest rate than otherwise statutorily authorized, codifies the common law concept of "moratory interest." *See Davis Cattle Co. v. Great W. Sugar Co.,* 393 F.Supp. 1165, 1186–87 (D.Colo.1975) (applying Colorado law), *aff'd,* 544 F.2d 436 (10th Cir.1976). Absent proof of the withholding party's gain or benefit, however, interest is awarded at the statutory rate of eight percent per year. *See* § 5–12–102(1)(b); *E.B. Jones Constr. Co. v. City & Cnty. of Denver,* 717 P.2d 1009, 1015 (Colo.App.1986).

¶ 22 The purpose of awarding moratory interest is two-fold: to discourage the withholding party from delaying payment until after judgment and to compensate the injured party accordingly. *Great W. Sugar Co. v. KN Energy, Inc.*, 778 P.2d 272, 276 (Colo.App.1989). Moratory interest is therefore intended to be compensatory, not punitive, in nature. *Id.*

¶ 23 For a plaintiff to recover moratory interest under section 5–12–102(1)(a), the plaintiff must demonstrate the defendant's gain or benefit realized on the withheld funds by a preponderance of the evidence. *See E.B. Jones Constr.*, 717 P.2d at 1015; *see also* § 13–25–127(1), C.R.S. 2014. The statute does not clarify the meaning of "gain or benefit realized," specify the plaintiff's evidentiary burden, or suggest a means of calculation. *See Great W. Sugar*, 778 P.2d at 274.

¶ 24 Likewise, Colorado courts have not drawn a clear line regarding what evidence is sufficient or what interest-calculating formula should be used. However, some proof demonstrating a defendant's gain or benefit and linking it to the withheld money or property is required. *E.B. Jones Constr.*, 717 P.2d at 1015 (holding that "absent proof of [the defendant's] gain from its retention of the money," the statutory rate applies); *see also Great W. Sugar*, 778 P.2d at 274 (awarding moratory interest because the plaintiff's interest-calculating model showed the specific amount of property withheld and the defendant's net profit gain on that specific amount).

¶ 25 We agree with the Tenth Circuit that this proof cannot be too speculative or general and must reflect the defendant's actual gain or benefit realized on the withheld funds. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1158 (10th Cir.2000) ("requiring 'specific proof' of the amount gained from the withheld funds"); *see also Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1093–94 (10th Cir.2001) (To satisfy section 512–102(1)(a), a plaintiff must " 'specifically* prove that the withholding party *actually* benefitted' " from the withheld funds. (quoting *Nw. Cent. Pipeline Corp. v. JER P'ship*, 943 F.2d 1219, 1229 (10th Cir.1991))) (emphasis added); *Great W. Sugar*, 778 P.2d at 274 (discussing section 5–12–102(1)(a)'s intent to compensate the injured party based on the withholding party's "benefit resulting from the wrongful withholding," and accepting the plaintiff's interest calculation because it connected the specific amount of property withheld to the defendant's profit); *E.B. Jones Constr.*, 717 P.2d at 1015 (affirming the district court's conclusion that "absent proof of [the defendant's] gain from its retention of the money, [the plaintiff's] moratory interest damages were to be measured at the statutory rate of 8%"). Once proven, "any benefit" or "increased profit" resulting from the wrongful withholding should be enjoyed by the injured party, not the wrongdoer. *Great W. Sugar*, 778 P.2d at 274, 276.

## C. Analysis

¶ 26 The following facts are undisputed. During the applicable period, BP did not maintain royalties, or the deductions withheld from royalties, in separate bank accounts. Instead, these funds were consistently placed in BP's master bank account and commingled with revenues from BP's other oil and gas operations throughout the United States.

¶ 27 BP used the commingled funds from the master bank account to invest in ongoing oil and gas operations throughout the United States, including oil and gas operations in Colorado. As pertinent here, BP used funds from this master account for the Fort Lupton Operations Center within the Southern Rockies Business Unit, which included BP's oil and gas operations in Adams and Weld Counties. Nothing in the record indicates that the specific money withheld from Royalty Owners was applied to these Colorado operations. Nonetheless, Royalty Owners argue that the annualized interest rates and capital gains from the Colorado oil and gas operations best depict BP's actual gain or benefit realized by withholding funds from Royalty Owners. We disagree.

¶ 28 Royalty Owners provide no link between BP's Colorado oil and gas operations and the specific money withheld from them.

Royalty Owners' experts analyzed various financial records containing the annualized percentage return on capital costs for BP's Colorado oil and gas operations to determine Royalty Owners' requested moratory interest award. However, the experts admittedly did not trace, or even attempt to trace, the specific withheld funds from BP's master bank account to BP's Colorado oil and gas operations. Moreover, the parties stipulated that "proceeds from the Adams and Weld County wells were not invested separately from other dollars generated elsewhere." Thus, it is entirely possible that the money withheld from Royalty Owners' royalties could have funded any of BP's ongoing operations across the United States or could have remained unused in the master bank account. Yet, the record does not reveal BP's rate of return on its operations throughout the United States [4] or BP's annual gain on the master bank account, where the funds were irrefutably placed.

¶ 29 Royalty Owners further argue that Colorado trust law jurisprudence permits tracing unmarked commingled funds to their ultimate location, and that they should therefore be permitted to do so here. *See, e.g., In re Marriage of Allen,* 724 P.2d 651, 657 (Colo.1986); *Cox v. Metro. State Bank, Inc.,* 138 Colo. 576, 583–84, 336 P.2d 742, 747 (1959); *Boston & Colo. Smelting Co. v. Reed,* 23 Colo. 523, 531–33, 48 P. 515, 518 (1897); *In re Marriage of Guinn,* 522 P.2d 755, 757 (Colo.App.1974) (not published pursuant to C.A.R. 35(f)).

¶ 30 While these cases permit tracing commingled money, the cases do not apply the standards of section 5–12–102(1)(a). Rather, they apply common law constructive trust standards. Here, we are guided by the plain language of section 5–12–102(1)(a), *see Vaughan v. McMinn,* 945 P.2d 404, 408 (Colo.1997) (applying the statute as written when language is clear and unambiguous), and case law interpreting its provisions— both of which require some causal link between the withheld funds and defendant's resulting gain or benefit.

¶ 31 Moreover, even when tracing commingled money is allowed in the constructive trust context, courts still require plaintiffs to connect the dollars withheld to the profit earned. *See Allen,* 724 P.2d at 660; *Cox,* 138 Colo. at 584, 336 P.2d at 747; *Reed,* 23 Colo. at 531–33, 48 P. at 518; *Guinn,* 522 P.2d at 757. In *Reed,* for example, the court held that the plaintiff was entitled to profits earned on money wrongfully withheld from him, even though the defendant commingled the money withheld into a general account. 23 Colo. at 531–33, 48 P. at 518. The court determined that because the defendant used the withheld funds indiscriminately in its singular business of buying and selling ores and therefore made a cognizable profit on those funds, the plaintiff was entitled to an award reflecting such profit. *Id.* In contrast to the plaintiffs in *Reed,* Royalty Owners did not prove that the withheld royalties were invested in Colorado's oil and gas operations, analyze the rate of return on BP's master bank account, or otherwise provide any causal link between the dollars withheld and an actual gain or benefit realized by BP on those dollars.

¶ 32 Royalty Owners also argue that the Tenth Circuit cases upon which the district court relied in granting BP's motion directly conflict with Colorado law. Thus, they claim, the court's reliance on those cases was improper. Again, we disagree.

¶ 33 The cases of this court, the supreme court, and the Tenth Circuit interpret section 5–12–102(1)(a) as requiring an injured plaintiff to prove a defendant's actual gain or benefit attributable to the money withheld to receive a moratory interest award above the statutory rate. *See, e.g., Echo Acceptance Corp.,* 267 F.3d at 1093–94; *Atl. Richfield,* 226 F.3d at 1158; *Great W. Sugar,* 778 P.2d at 274; *E.B. Jones Constr.,* 717 P.2d at 1015. Because we see no inconsistency or conflict

---

4. Royalty Owners note that they requested that BP produce financial information from each of its oil and gas operations throughout the United States, and BP objected. The district court denied Royalty Owners' motion to compel the documents. Royalty Owners do not challenge that ruling on appeal. Therefore, we need not address the discovery request. *See Flagstaff Enters. Constr. Inc. v. Snow,* 908 P.2d 1183, 1185 (Colo. App.1995) (declining to address an issue not properly raised on appeal).

in these decisions, we conclude that the district court's reliance on them was appropriate.

¶ 34 Based on this analysis, and in light of the parties' stipulations, we conclude that there was no genuine issue of any material fact necessary for the determination of the legal question and that the district court's grant of BP's C.R.C.P. 56(h) motion was proper.

## III.  Directed Verdict or JNOV

¶ 35 BP contends that the district court erred in denying BP's requests for a directed verdict and JNOV because (1) Royalty Owners could not prove their fraudulent concealment and equitable tolling claims for all class members; and (2) the evidence demonstrated that Royalty Owners' gas was undisputedly marketable at the well and therefore the post-production deductions from Royalty Owners' royalties were proper.  We address and reject each contention below.

### A.  Standard of Review

¶ 36 We review de novo a district court's ruling on a motion for a directed verdict or JNOV, viewing the evidence in the light most favorable to the nonmoving party. *Vaccaro v. Am. Family Ins. Grp.*, 2012 COA 9, ¶ 40, 275 P.3d 750; *Farmland Mut. Ins. Cos. v. Chief Indus., Inc.*, 170 P.3d 832, 838 (Colo. App.2007).  A directed verdict is appropriate where the evidence compels the conclusion that "reasonable jurors could not disagree" and that "no evidence or inference has been received at trial upon which a verdict against the moving party could be sustained." *Brossia v. Rick Constr., L.T.D. Liab. Co.*, 81 P.3d 1126, 1131 (Colo.App.2003).  Similarly, a JNOV motion should be granted only if the evidence is such that no reasonable person could reach the same conclusion as the jury. *Hall v. Frankel*, 190 P.3d 852, 862 (Colo.App. 2008).

---

5.  Fraudulent concealment also requires that the plaintiff demonstrate (1) the concealment of a material fact that in equity and good conscience should be disclosed; (2) knowledge on the part of the defendant that such a fact is being concealed; and (3) the intention that the concealment be acted upon. *BP Am. Prod. Co. v. Pat-*

### B.  Fraudulent Concealment and Equitable Tolling

¶ 37 BP argues that Royalty Owners did not prove fraudulent concealment or equitable tolling on a class-wide basis because the evidence demonstrated that individual class members were not ignorant of the deductions, did not rely on BP's alleged concealment of the deductions, and did not diligently inquire into the matter, and no reasonable juror could have concluded otherwise.  We disagree.

#### 1.  Governing Law

¶ 38 The six-year statute of limitations in section 13–80–103.5(1)(a) may be tolled if the plaintiffs can prove that the defendant fraudulently concealed material elements giving rise to their claims. *First Interstate Bank of Fort Collins, N.A. v. Piper Aircraft Corp.*, 744 P.2d 1197, 1200 (Colo. 1987).  To establish fraudulent concealment, the plaintiffs must demonstrate that they were ignorant of the defendant's concealment, that they relied on the concealment to their detriment, and that they were unable, by reasonable diligence, to discover facts necessary to determine the existence of a claim for relief. *Id.* at 1200–01.[5]

¶ 39 The ignorance, reliance, and due diligence elements of fraudulent concealment may be inferred from circumstantial evidence common to the class. *BP Am. Prod.*, 263 P.3d at 111.

#### 2.  Analysis

¶ 40 At trial, the fraudulent concealment evidence, viewed in the light most favorable to Royalty Owners, *see Vaccaro*, ¶ 40, revealed the following.  The class consisted of approximately 4000 Royalty Owners.  All of them received the same royalty statements, and none of the statements disclosed any post-production deductions.  BP consciously decided not to disclose the use of the

---

*terson*, 263 P.3d 103, 109 (Colo.2011).  BP, however, did not contest Royalty Owners' ability to establish these elements pretrial, nor do they do so on appeal.  Accordingly, we need not address them. *See Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm, L.L.C.*, 2012 CO 61, ¶ 18, 287 P.3d 842.

netback method or post-production costs to Royalty Owners, despite an internal committee's recommendation that full disclosure be provided. The record contains no evidence that BP ever informed Royalty Owners that their wells had been deregulated.

¶41 Approximately forty class members were oil and gas participants. Two Royalty Owners, Petroleum Energy Corporation (PEC) and Abraxas Petroleum (Abraxas), used the netback methodology themselves. PEC disclosed its cost deductions to its royalty owners, and its representative testified that he had no reason to know that BP was deducting undisclosed costs. Abraxas did not know how gas industry participants distributed royalties in Colorado, did not know that BP was deducting marketing costs from its royalties, and "was not aware of" any deceit by BP.

¶42 A representative for another Royalty Owner and gas industry participant, Anchor Bay Corporation, testified that the division and transfer orders provided notice that BP might start deducting post-production costs but that "he never got any information from BP" that the wells had been deregulated or that BP actually started deducting such costs. Likewise, a corporate representative for High Plains Energy, another Royalty Owner, testified that the division and transfer orders "very clearly" stated how BP was going to start calculating royalties post-deregulation, but the representative denied knowledge that deregulation had occurred or that BP had begun deducting post-production costs from royalties.

¶43 Plaintiff Patterson also testified that the division and transfer orders disclosed that BP might start deducting costs from royalties, but stated that BP never communicated to him that it had begun doing so or that Royalty Owners' wells had been deregulated. In addition, BP's representative at trial, John Smith, testified that he had no evidence that BP ever told any Royalty Owners that the wells had been deregulated.

¶44 One class member's wife had questions about the royalty statements but did not express her concerns to BP. Two other class members expressed concerns about the accuracy of their royalty checks and received letters from BP stating that the checks were correct, but not disclosing the deductions. Several other class members testified that they did not review or question their royalty statements because they had no reason to assume that BP was not calculating the payments correctly.

¶45 Viewing this evidence in the light most favorable to Royalty Owners, as the law requires of us, see Vaccaro, ¶40, we conclude that the evidence was sufficient to send the issue of fraudulent concealment to the jury. We also conclude that reasonable jurors could find that these class members, and the remainder of Royalty Owners, were ignorant of BP's concealed royalty deductions, relied on BP's concealment, and were unable, using reasonable diligence, to discover the concealment. See First Interstate Bank, 744 P.2d at 1200–01. Accordingly, the district court did not err in denying BP's motions for a directed verdict and JNOV.

## C. Marketability of Gas at the Well

¶46 Relying on Rogers v. Westerman Farm Co., 29 P.3d 887, 903 (Colo. 2001)—which holds that if gas is first marketable at the wellhead and post-production costs are reasonably incurred to enhance the value of the already-marketable gas, these costs may be shared by the lessees and the lessors—BP also argues that Royalty Owners presented insufficient evidence to support their claim that BP improperly deducted post-production costs from royalties based on Royalty Owners' allegation that the gas was not marketable at the well. Thus, BP claims, the district court should have directed a verdict or granted JNOV on the issue. We disagree.

### 1. Governing Law

¶47 Colorado law dictates that where, as here, royalty agreements are silent on the allocation of post-production costs, the "implied covenant to market must be considered in determining the rights and obligations of the parties." Rogers, 29 P.3d at 902; accord Garman v. Conoco, Inc., 886 P.2d 652, 658–59 (Colo.1994). The implied covenant to market obligates the lessee (BP), not the lessors (Royalty Owners), to make

the gas marketable. *Rogers*, 29 P.3d at 903. Thus, the lessee alone must incur any post-production costs necessary to place the gas in a condition acceptable for the market. *Id.* at 902–03; *Garman*, 886 P.2d at 659. "[R]oyalty interest owners are not obligated to share in these costs," *Garman*, 886 P.2d at 659, and a lessee is not permitted to deduct from royalty payments any post-production costs required to make the gas marketable, *Rogers*, 29 P.3d at 903.

¶ 48 However, this implied duty to market is limited only to post-production costs required to transform raw gas into a marketable product. *Garman*, 886 P.2d at 660. Royalty calculations should therefore be made at the point where a first marketable product is obtained. *Rogers*, 29 P.3d at 904. If the product is already marketable at the wellhead, and post-production costs are incurred to merely enhance the value of the already-marketable gas, those costs may be shared by the lessee and the lessors. *Garman*, 886 P.2d at 661; *see also Rogers*, 29 P.3d at 900.

¶ 49 Thus, the determination of who bears the post-production marketability costs when the royalty agreement is silent depends on where the gas is first marketable—more specifically, whether the gas at issue is marketable at the wellhead, and if not, where the first marketable product is obtained. *Rogers*, 29 P.3d at 906.

¶ 50 The supreme court in *Rogers*, 29 P.3d at 903–06, established the standards to determine gas marketability and to allocate post-production costs accordingly. The court explained:

> In defining whether gas is marketable, there are two factors to consider, condition and location. First, we must look to whether the gas is in a marketable condition, that is, in the physical condition where it is acceptable to be bought and sold in a commercial marketplace. Second, we must look to location, that is, the commercial marketplace, to determine whether the gas is commercially saleable in the oil and gas marketplace.

*Id.* at 905 (footnote omitted). Thus, gas is marketable as soon as its physical condition

and location satisfy the requirements above. *Id.* Further, "the determination of when gas is first-marketable is driven in part by the commercial realities of the marketplace." *Id.*

¶ 51 Ultimately, the determination of marketability is a question of fact, to be resolved by the fact finder, and "[a]ll costs must be reasonable." *Id.* at 905–06.

¶ 52 To recover at trial, Royalty Owners had to demonstrate, by a preponderance of the evidence, that the gas at issue was not already marketable at the wellhead and, therefore, that BP was responsible for any costs incurred in making the gas marketable. If, however, the gas was already marketable at the wellhead, given the otherwise silent agreement, *Rogers* dictates that Royalty Owners and BP should have proportionately shared the post-production costs.

### 2. Analysis

¶ 53 Pursuant to *Rogers*, 29 P.3d at 905, and applying the governing standard of review, *see Vaccaro*, ¶ 40, we consider the evidence presented at trial regarding the condition and location of the wellhead gas produced from Royalty Owners' wells. Specifically, we look to evidence regarding (1) whether the gas was in a condition such that it was acceptable to be bought and sold in a commercial marketplace, *see Rogers*, 29 P.3d at 905, and (2) when the gas became commercially saleable in the oil and gas marketplace. *Id.*

¶ 54 Although conflicting evidence was presented, the marketability evidence, viewed in the light most favorable to Royalty Owners, *see Vaccaro*, ¶ 40, revealed the following.

¶ 55 During the Class Time Period, gas from Royalty Owners' wells was extracted and processed at BP's Spindle and Wattenberg processing plants, both of which were located in the DJ Basin. This gas was then filtered through long distance pipelines and ultimately delivered to customers in Kansas. A former BP employee described this process at length and explained that the gas extracted from Royalty Owners' wells was consistently sent to BP's plants to remove any impurities, such as carbon dioxide and hydrogen sulfide.

¶ 56 Royalty Owners' experts, Daniel Reineke and Phyllis Bourque, further testified to the gas's condition and marketability at the wellhead location. Both stated that BP produced raw gas from Royalty Owners' wells that was not readily marketable, in condition or location, until after processing at the plants.

¶ 57 Specifically, Reineke described this wellhead gas as "gas that has yet to be treated or processed" because "it contains all of the gaseous contaminates, hydrocarbon liquids, etcetera .... [and] it's not in any kind of pure form yet." He later stated that "contaminants" and "natural gas liquids" "needed to be extracted or treated out of the gas in order for [it] to meet the pipeline quality specs." Reineke added that BP consistently gathered, compressed, dehydrated, treated, and processed the gas at a location other than the wellhead before the gas's entry into the long distance pipeline and subsequent sale. He explained that BP could not sell the gas "until it's separated" and "fractioned into purity products." Reineke concluded that the first commercial market for the gas extracted from Royalty Owners' wells was at the inlet of the long distance pipelines, not at the wellhead, because "that's where the market is," and "that's where [BP] sold the gas." Reineke also testified that, after reviewing all of the exhibits and documents related to the case, he "was not aware" of any gas sales to BP's customers at the wellhead.

¶ 58 Bourque testified that gas from Royalty Owners' wells was not marketable until it was "in a quality to be accepted by the pipeline and to be purchased by the market." Bourque added that there was "no index for wellhead gas [and] no pricing for wellhead gas ... only pricing for quality gas that [was] on the point of delivery transmission pipelines." She also confirmed that BP consistently sold its gas products after fractioning or separating out any impurities at BP's processing plants. Bourque concluded that the first commercial market for the gas produced from Royalty Owners' wells depended on the specific type of gas extracted and was located either at the tailgate of the Wattenberg and Spindle Plants (where the gas entered into the long distance pipeline) or after fractionation in Kansas, but not at the wellhead meter.

¶ 59 BP's expert, Kyle Pearson, testified that DJ Basin gas contains "relatively low levels" of carbon dioxide and "negligible" hydrogen sulfide and is commonly referred to as "sweet gas." He stated that DJ Basin, where Royalty Owners' wells were located, contains extensive pipelines, gathering systems, and processing plants "willing to accept gas with their own set of specifications at the wellhead meter." Pearson testified that Royalty Owners' experts were "absolutely incorrect" because although "gas may be bought and sold again several times, ... the first location where it can be bought and sold is when it can be measured and sampled," which may be done at the wellhead.

¶ 60 Another of BP's experts, David Posner, testified that "there [was] and continues to be an active commercial market for raw gas at the wellhead" in the DJ Basin, where Royalty Owners' wells were located. Posner also testified that at least twenty upstream gas operating companies and "half a dozen" midstream companies in the DJ Basin were selling their gas "predominately at the wellhead" during the Class Time Period. He added that even though a company might sell gas along the distribution chain, such as at the tailgate of a processing plant, "the wellhead market is still an option."

¶ 61 BP also presented evidence that it was buying gas at the wellhead from independent producers. A former BP employee, John Hurtado, testified, however, that the independent producers sold gas from the wellhead only because "they either had to sell it or pay to transport and incur the costs of having it processed." Royalty Owners' expert Bourque added that the wellhead gas BP purchased from other Colorado gas producers was unrelated to Royalty Owners' wells and was not in a marketable condition until BP processed it. At least one class member, who was a gas industry participant, testified that his company sold gas from the wellhead meter. This class member did not, however, specify the condition of this wellhead gas and agreed that the gas was thereafter sent out "for processing."

¶ 62 Finally, BP presented evidence of sales contracts between BP and Panhandle Eastern Pipeline Company (Panhandle) demonstrating that BP sold gas to Panhandle at the well. However, Royalty Owners presented contrary testimony that BP only sold specific portions of raw gas to Panhandle and reserved the marketable natural gas liquids for itself, which it thereafter processed, fractioned, and sold elsewhere.

¶ 63 This is only a fraction of the evidence presented to the jury at trial. Both parties proffered numerous exhibits attesting to the condition of the gas at the wellhead and the location of various commercial markets for the product. The parties called numerous witnesses, in addition to those described above, who presented varying explanations about when the gas extracted from Royalty Owners' wells became marketable.

¶ 64 Viewing all the evidence in the light most favorable to Royalty Owners, *see Vaccaro,* ¶ 40, we conclude that a reasonable person could believe Royalty Owners' evidence and determine, for the purpose of calculating royalties, that the wellhead was not the first market for gas extracted from the wells during the Class Time Period. *See id.* at ¶ 46 (recognizing that disputed material facts are matters for the jury); *see also Rogers,* 29 P.3d at 904–06 (acknowledging that the first market is not simply where the gas is bought and sold but also where the gas is " 'sufficiently free from impurities' " (quoting *Garman,* 886 P.2d at 660–61 n. 26)); *Clough v. Williams Prod. RMT Co.,* 179 P.3d 32, 38 (Colo.App.2007) (acknowledging, as persuasive, evidence that gas was not marketable at the wellhead in part because the gas had to be treated at processing plants before it could be sold on the market); *Savage v. Williams Prod. RMT Co.,* 140 P.3d 67, 70–72 (Colo.App.2005) (affirming that gas was not marketable at the wellhead because "it had to be processed and transported to the pipeline before it could be sold" and adding that offers to purchase wellhead gas were "merely evidence to be considered in determining whether there was a commercial market for the gas," not conclusive evidence of marketability).

¶ 65 Because we cannot conclude, as BP contends, that "no evidence or inference has been received at trial upon which a verdict against the moving party could be sustained," *Brossia,* 81 P.3d at 1131, we must conclude that the district court did not err in denying BP's motions for a directed verdict and for JNOV.

## IV. Jury Instructions

¶ 66 BP next contends that the district court erred in declining to instruct the jury that "[i]f a person signs a contract without reading it, that person is barred from claiming he or she is not bound by what it says." We disagree.

### A. Law and Standard of Review

¶ 67 "A trial court is obligated to correctly instruct the jury on the law applicable to the case." *Jordan v. Bogner,* 844 P.2d 664, 667 (Colo.1993). So long as this obligation is met, the court retains broad discretion over the form and style of the instructions, and an appellate court will not overturn the court's decision absent a showing of an abuse of discretion. *Clough,* 179 P.3d at 40. A court abuses that discretion when its decision is manifestly arbitrary, unreasonable, unfair, or misapplies the law. *Day v. Johnson,* 255 P.3d 1064, 1067 (Colo. 2011).

¶ 68 Rejecting a tendered instruction that properly instructs the jury on the applicable law in the case and the evidence at issue, which are not adequately covered elsewhere, is error. *Schuessler v. Wolter,* 2012 COA 86, ¶ 26, 310 P.3d 151. We will not reverse based on an improper jury instruction unless it prejudices a party's substantial rights and the record shows that the jury might have returned a different verdict had a proper instruction been given. *Clough,* 179 P.3d at 40.

### B. Analysis

¶ 69 BP contends that its tendered instruction directly related to the ignorance requirement of Royalty Owners' fraudulent concealment and equitable tolling contentions. According to BP, the royalty con-

tracts, particularly the division and transfer orders, provided Royalty Owners with knowledge of the deductions, and that the jury therefore needed to know that Royalty Owners were legally bound by the contract language. *See Cordillera Corp. v. Heard*, 41 Colo.App. 537, 540, 592 P.2d 12, 14 (1978) ("[T]he plaintiff is presumed to know the contents of a contract signed by it."), *aff'd*, 200 Colo. 72, 612 P.2d 92 (1980). Therefore, BP argues, the district court erred in not instructing the jury accordingly. We disagree.

¶ 70 The ignorance requirement under Royalty Owners' fraudulent concealment claim was properly explained to the jury in Instruction 16, which stated that Royalty Owners must have been "ignorant" of the "material facts" giving rise to their claims "in order to prove their fraudulent concealment excuse for missing the statute of limitations."

¶ 71 BP's tendered instruction attempted to highlight a particular piece of evidence— the royalty contracts—in a way that would have confused jurors, incorrectly informed them on the issues in the case, and improperly directed them as to the proper weight to give the contracts. *See Krueger v. Ary*, 205 P.3d 1150, 1157 (Colo.2009); *see also Clough*, 179 P.3d at 40.

¶ 72 The crux of the contractual issue was not whether Royalty Owners signed or read the contracts, or even whether they were bound by the contractual language. Rather, the issue was whether the contracts and the additional evidence presented at trial adequately informed Royalty Owners of BP's intent to deduct post-production costs from their checks. In other words, there was no dispute over what the contracts stated, and Royalty Owners never claimed they were not bound by the contracts. The heart of the contractual issue was whether the language used—coupled with the evidence presented at trial—sufficiently put Royalty Owners on notice of BP's post-production cost deductions.

¶ 73 Accordingly, the court's refusal to instruct the jury on a tangential aspect of Colorado law that did not accurately address the controversy was not arbitrary, unreasonable, or unfair—especially given the potential

that the proffered instruction would confuse the issues in the case. *See Day*, 255 P.3d at 1067.

¶ 74 Moreover, "instructions emphasizing specific evidence" are disfavored. *Krueger*, 205 P.3d at 1157. The supreme court in *Krueger* held that "a trial court has no duty to select [among] the salient points in the evidence ... and specifically call them to the attention of the jurors, because such pointed instructions tend to confuse the jury and result in incorrect directives regarding evidentiary weight." *Id.* (internal quotation marks omitted). The *Krueger* court therefore disapproved of jury instructions that emphasized specific evidence and thereby misstated the law. *Id.* BP argues that its proposed instruction did not misstate the law and, therefore, *Krueger* does not apply. We disagree. Regardless of whether BP's jury instruction correctly stated the law, the same policy concerns in *Krueger* regarding confusing the issues the jury is to decide and improperly dictating evidentiary weight apply here. *See id.*

¶ 75 Accordingly, the court's refusal to instruct the jury as BP requested was not an abuse of discretion. *See Clough*, 179 P.3d at 40; *see also Vista Resorts, Inc. v. Goodyear Tire & Rubber Co.*, 117 P.3d 60, 70 (Colo. App.2004) ("[I]f the other instructions adequately inform the jury of the applicable law, the trial court does not err in refusing a legally correct tendered instruction.").

## V. Class Certification

¶ 76 Finally, BP argues that the district court erred in denying its motion to decertify the class. We disagree.

## A. Standard of Review

¶ 77 Whether to decertify a class action lies within the district court's discretion, and we will not disturb its decision absent a showing of abuse of discretion. *Farmers Ins. Exch. v. Benzing*, 206 P.3d 812, 817–18 (Colo.2009). A district court abuses its discretion if its decision is manifestly arbitrary, unreasonable, unfair, or misapplies the law. *Jackson v. Unocal Corp.*, 262 P.3d 874, 880 (Colo.2011). "[S]o long as the trial court

rigorously analyzes the evidence, it retains discretion to find to its satisfaction whether the evidence supports [class certification]." *Id.* at 884.

### B. Applicable Law

¶ 78 "The basic purpose of a class action is to eliminate the need for repetitious filing of many separate lawsuits involving the interests of large numbers of persons and common issues of law or fact by providing a fair and economical method for disposing of a multiplicity of claims in one lawsuit." *Mountain States Tel. & Tel. Co. v. Dist. Court,* 778 P.2d 667, 671 (Colo.1989). A plaintiff seeking class certification bears the burden of establishing that the requirements of C.R.C.P. 23 have been met. *Jackson,* 262 P.3d at 881. Where, as here, a plaintiff seeks class certification under C.R.C.P. 23(b)(3), certification is appropriate if "questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and ... a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

¶ 79 The predominance inquiry is a "fact-driven, pragmatic inquiry," and the district court must determine "whether the proof at trial will be predominantly common to the class or primarily individualized." *Medina v. Conseco Annuity Assurance Co.,* 121 P.3d 345, 348 (Colo.App.2005). C.R.C.P. 23 should be liberally construed in light of its policy of favoring the maintenance of class actions, *LaBerenz v. Am. Family Mut. Ins. Co.,* 181 P.3d 328, 333–34 (Colo.App.2007), and a court must generally accept as true the allegations in support of certification, *Benzing,* 206 P.3d at 818. Ultimately, however, the district court must exercise its discretion to determine whether common issues predominate over individual ones and whether

the claims can be managed as a class action. *See id.* at 818–20.

¶ 80 As explained in Part III.B, when a six-year statute of limitations, here section 13–80–103.5(1)(a), bars the class action, the statute may be tolled if the plaintiffs can prove the elements of fraudulent concealment, specifically ignorance, reliance, and due diligence. *See First Interstate Bank,* 744 P.2d at 1200. When certifying a class, the district court may infer these elements from circumstantial evidence common to the class, *BP Am. Prod.,* 263 P.3d at 111; as long as the class-wide inferences still permit common issues to predominate over individual issues for the purposes of C.R.C.P. 23(b)(3). *Id.* In other words, so long as common issues predominate, a fraudulent concealment contention is amenable to class-wide adjudication. *Id.* at 112.

¶ 81 Once granted, certification is "inherently tentative," *Benzing,* 206 P.3d at 818 (internal quotation marks omitted), and a district court has a "duty to monitor, and the flexibility to alter, the class certification decision in light of any new evidence." *Jackson,* 262 P.3d at 883.

### C. Analysis

¶ 82 BP argues that, following the second remand, it uncovered damaging new evidence regarding individual Royalty Owners that attested to their knowledge of BP's royalty deductions and undermined Royalty Owners' fraudulent concealment and equitable tolling contentions on a class-wide basis. BP highlights the following new facts [6] which it contends "conclusively disprove[ ] the class-wide inference on which certification was based."

- Two class members—PEC and Abraxas—were gas industry participants who

---

6. BP further asserts additional facts presented at trial to support the pretrial decertification request. These facts, however, were not before the district court when it considered BP's motion to decertify, and we will not consider them in determining whether the court abused its discretion. *See Moody v. People,* 159 P.3d 611, 614 (Colo. 2007) (declining to consider later district court record when reviewing a pretrial ruling). BP also alleges that it could have uncovered more

individual facts regarding Royalty Owners' fraudulent concealment contentions if the district court had not denied BP's request to survey all class members. However, BP does not challenge that ruling on appeal, and we therefore need not address the discovery request. *See Flagstaff Enters.,* 908 P.2d at 1185. And, although the district court limited the number of depositions available to BP, BP selected which witnesses to depose.

were familiar with the netback calculation method and had used it themselves to calculate royalties.

- Several class members—Abraxas, Anchor Bay, and High Plains Energy—confirmed that the division orders signed by the Royalty Owners provided notice that BP was going to deduct from Royalty Owners' royalties the costs of making the gas marketable.

- Because these class members either knew about the netback method generally or knew that their division orders authorized deductions, they should have known that BP was actually using a netback methodology to deduct post-production costs or should have diligently inquired further.

- Other class members did not read their royalty agreements, did not review their monthly royalty check stubs, and did not, therefore, directly rely upon the agreements or check stubs, as required to prove class-wide fraudulent concealment.

¶ 83 In denying BP's decertification request, the district court determined:

- Evidence showing that class members were aware of the netback method generally did not equate to knowledge that BP was using and concealing its use of the method and did not, therefore, rebut Royalty Owners' evidence of class-wide ignorance of alleged underpayments.

- Pursuant to the first appeal in this case, the division and transfer orders did not provide Royalty Owners with actual knowledge that BP was using the netback method or deducting post-production costs, "absent communication by BP to [Royalty Owners] that their wells were deregulated." *See also Patterson*, 159 P.3d at 640. BP offered no evidence that it informed any of the Royalty Owners that the wells had been deregulated.

- Despite BP's new evidence, Royalty Owners were entitled to an inference of due diligence because they were not under any affirmative duty to question the royalty payments when they, in good faith, relied on the language of their contracts and BP never communicated any changes to them.

- Contrary to BP's assertion, "almost all of [the deposed Royalty Owners] did in fact review the check stubs and all of them assumed that the information provided by the company could be relied upon."

¶ 84 The district court then concluded that the questions of law or fact common to the members of the class predominated over any questions affecting only individual members and denied BP's motion to decertify. We conclude that this determination is supported by a rigorous analysis of the evidence and did not constitute an abuse of discretion. *See Jackson*, 262 P.3d at 884.

¶ 85 In so concluding, we reject BP's arguments that (1) fraudulent concealment is inappropriate for class-wide resolution; (2) the court ignored the vast differences between class members' claims of ignorance, reliance, and diligence; and (3) the court committed legal error when it ignored evidence of Royalty Owners' constructive knowledge of, and subsequent ability to discover, the royalty deductions.

¶ 86 First, the supreme court concluded in *BP America Production*, 263 P.3d at 112–13, that fraudulent concealment is appropriate for class-wide resolution, and we cannot disturb this conclusion, *see People v. Gladney*, 250 P.3d 762, 768 (Colo.App.2010) ("[W]e are bound to follow supreme court precedent."); *see also Bennett Coll. v. United Bank of Denver, Nat'l Ass'n*, 799 P.2d 364, 366–69 (1990) (declining to address an issue which had already been actually litigated and necessarily adjudicated and was, therefore, precluded from further review).

¶ 87 Second, the district court did not ignore the differences among class members. Rather, the court's order reflects an extensive consideration of the class members' differences, as presented by BP. In fact, nothing in the record suggests that the court ignored any evidence presented by BP. The court properly reviewed the depositions of the pertinent class members and the parties' written arguments and found that none of the testimony or evidence defeated the class-wide inferences of ignorance, reliance, and due diligence. *See Jackson*, 262 P.3d at 884.

¶ 88 Third, the court did not ignore evidence of class members' constructive knowledge of BP's deductions or declare, as BP

contends, that "only actual knowledge can defeat a claim for equitable tolling." The court stated, "None of the deposition testimony ... establishes that any of the corporate class members had *actual knowledge* that [BP] was deducting costs prior to making royalty payments." However, the court did not say that this lack of actual knowledge necessarily tolled the statute of limitations. Rather, the court analyzed the equitable tolling requirements and considered whether the class members should have known about BP's deductions by conducting further inquiry. · The court then concluded that Royalty Owners had no reason to suspect that anything was being concealed from them and therefore no duty to inquire into the deductions. Thus, the district court properly analyzed whether Royalty Owners "should have known" or had constructive knowledge about BP's deductions.

¶ 89 Accordingly, we conclude that the district court did not abuse its discretion in denying BP's motion to decertify the class.

### VI. Conclusion

¶ 90 The judgment is affirmed.

JUDGE J. JONES and JUDGE STERNBERG * concur.